319 P.3d 382

STATE of Hawai'i, Respondent/Plaintiff–
Appellee,

v.

Phillip DeLEON, Petitioner/Defendant–
Appellant.

No. SCWC–11–0000064.

Supreme Court of Hawai'i.

Jan. 15, 2014.

464

Phyllis J. Hironaka for petitioner.

Sonja P. McCullen for respondent.

RECKTENWALD, C.J., NAKAYAMA, and McKENNA, JJ., with ACOBA, J., concurring and dissenting separately, with whom POLLACK, J. joins.

Opinion of the Court by
RECKTENWALD, C.J.

Phillip DeLeon was convicted of Murder in the Second Degree, two counts of Carrying or Use of a Firearm in the Commission of a Separate Felony, and several other charges,[1] in relation to the July 31, 2009 fatal shooting of Shawn Powell. The State alleged, inter alia, that DeLeon shot Powell and shot at Powell's friend, Justin Gamboa, following an altercation at a nightclub. On appeal, the Intermediate Court of Appeals reversed the Circuit Court of the First Circuit's[2] judgment as to DeLeon's conviction for one count of Carrying or Use of a Firearm in the Commission of a Felony, but affirmed DeLeon's remaining convictions.

DeLeon raises two issues in his application for writ of certiorari. First, DeLeon argues that his trial attorney provided ineffective assistance of counsel by committing errors that resulted in the circuit court precluding expert testimony regarding the presence of cocaine in Powell's blood at the time of the shooting. Second, DeLeon argues that the circuit court's jury instruction, modeled after the then-current Hawai'i Pattern Jury Instructions–Criminal (HAWJIC) 7.01 with regard to self-defense "failed to completely and properly instruct the jury on the law of self-defense."

We conclude that DeLeon has failed to establish that his trial counsel was ineffective with regard to the admissibility of expert testimony on cocaine use. However, we further conclude that the circuit court plainly erred in excluding such testimony. The defense expert was prepared to testify that, to a reasonable degree of scientific probability, Powell was under the influence of cocaine at the time of the shooting. However, the circuit court erroneously required that the testimony be offered to a reasonable degree of scientific certainty, and accordingly excluded the testimony. This error was not harmless beyond a reasonable doubt, and thus we vacate DeLeon's convictions for second-degree murder (Count II) and Carrying or Use of a Firearm While Engaged in the Commission of a Separate Felony (Count IV), and remand for a new trial.

With regard to the jury instruction on self-defense, we conclude that the circuit court's instruction accurately stated the law and thus was not erroneous.

Accordingly, we vacate in part and affirm in part the ICA's judgment, and vacate the circuit court's judgment of conviction and

---

1. As explained infra, DeLeon was also convicted of two counts of Reckless Endangering in the First Degree, and Ownership or Possession Prohibited of Any Firearm or Ammunition by a Person Indicted for Certain Crimes.

2. The Honorable Virginia L. Crandall presided.

sentence on Counts II and IV, and remand to the circuit court for further proceedings consistent with this opinion.

## I. Background

The following factual background is taken from the record on appeal.

### A. Circuit Court proceedings

On August 5, 2009, DeLeon was indicted for: Attempted Murder in the First Degree as to Powell and Gamboa (Count I); Murder in the Second Degree as to Powell, in violation of HRS §§ 707–701.5 and 706–656 (Count II) [3]; Attempted Murder in the Second Degree as to Gamboa, in violation of HRS §§ 705–500, 707–701.5, and 706–656 (Count III); Carrying or Use of Firearm in the Commission of a Separate Felony in violation of HRS § 134–21 as to Count II (Count IV); Carrying or Use of Firearm in the Commission of a Separate Felony in violation of HRS § 134–21 as to Count III (Count V); Place to Keep Pistol or Revolver in violation of HRS § 134–25 (Count VI); Reckless Endangering in the First Degree in violation of HRS § 707–713 (Count VII); and Ownership or Possession Prohibited of Any Firearm or Ammunition by a Person Convicted of Certain Crimes in violation of HRS §§ 134–7(b) and (h) (Count VIII).

#### 1. State's first motion in limine to exclude cocaine evidence

Prior to trial, on August 24, 2010, the State filed a motion in limine, seeking, inter alia, to exclude any evidence that Powell's blood tested positive for .05 mg/L of cocaine on grounds that such evidence is inadmissible under Hawai'i Rules of Evidence (HRE) Rule 404(b) [4] and/or irrelevant and unfairly prejudicial under HRE Rule 403.[5]

DeLeon opposed the State's motion, arguing, inter alia, that evidence that Powell's blood tested positive for .05 mg/L of cocaine was "essential and probative to [DeLeon's] self-defense assertion, and its exclusion would be extremely prejudicial to his claims[.]" Among the exhibits attached to DeLeon's opposition was a letter from Dr. Clifford G. Wong, the Toxicology Laboratory Director for Clinical Laboratories of Hawaii. The letter indicated that DeLeon's defense counsel retained Dr. Wong as an expert in "DUI toxicology" and largely discussed Powell's blood alcohol concentration. With regard to Powell's cocaine concentration at the time of the shooting, Dr. Wong stated, in relevant part:

> The retrograde extrapolation of [ ] Powell's blood cocaine concentration to the time of the shooting was performed to yield a probable range of 0.06 to 0.08 mg/L. The time of cocaine ingestion is unknown, so the actual cocaine dosage cannot be determined. Information regarding total amount ingested and the time of ingestion would be required to determine more accurately whether [ ] Powell has [sic] under the influence of cocaine at the time of the shooting.

(Emphasis added).

At a hearing on the motion, the circuit court noted that "[t]he issue right away that

---

3. HRS § 707–701.5 (1993) provides in relevant part, "a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person." HRS § 706–656(2) (Supp.2010) provides in relevant part: "[P]ersons convicted of second degree murder ... shall be sentenced to life imprisonment with possibility of parole."

4. HRE Rule 404(b) (Supp.2010) provides:

 Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, prepa-

ration, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

5. HRE Rule 403 (1993) provides:

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

the Court [saw]" was Dr. Wong's statement that he would need more information. Defense counsel responded:

I have since spoken to Dr. Wong. This is what I expect the proof to be: First, respectfully, if you would, keeping in mind we have a video of Powell going towards the defendant after at least three warning shots were fired and saying some things that will come out that my client heard. There's loud screaming. We have a witness from the manager of the Seoul Karaoke that heard two men screaming and then a shot or shots.

This is what Dr. Wong says—and we've subpoenaed [medical examiner Dr. William] Goodhue, who was—who did the toxicology and autopsy. He says that the cocaine was of recent use, and all that means is—I mean, what does "recent" mean? But with the doctors and ... Dr. Wong, "recent use" means probably within 24 hours because the cocaine was still in the blood, it had not been completely absorbed. Dr. Wong says when ... there's a use of cocaine ... it gives—and he will testify, if he's allowed to—someone a sense of euphoria, and he defines euphoria as invincibility, like you think you're Superman, which is consistent with why anyone would be going after someone who's firing three shots in the air. My client will testify that when he was grabbed—and he has seen people, and he will testify, on the west side and when he was in California that he thought were high on something. And when he was grabbed in the bar by the victim, his testimony will be ... this guy was drunk but there was something wrong with this guy, he looked like he was high on something[.]

And then we have the cocaine, the invincibility, the Superman, and then there's an explanation as to why this guy is doing this. Their witnesses say they thought Powell was crazy that he would be going after someone that just fired a gun in the air and just went right after him.

So I don't mind a [HRE Rule] 104 hearing[6] as well, but it's the euphoria that the cocaine gives. We have the toxicology re-

port that says recent use. We have the testimony from the defendant who says this guy looked like he was on something. Now, if he says that, then I think he has the right to say that. If it's not buttressed or corroborated by the medical testimony and the expert testimony, it may look like it's simply a self-serving statement he wants to make with no basis in fact.

The DPA then argued for an HRE Rule 104 hearing:

[I]t's the state's understanding that cocaine does not have a consistent effect on people like alcohol does. I think that this euphoric state can also be a dysphoric state and I think that the witness would testify to that, that he cannot describe the states that people go through on a consistent basis, ... even knowing or being able to retro-extrapolate the amount of cocaine that was in the blood at the time of the specific incident.

The circuit court ruled that it would conduct an HRE Rule 104 hearing before allowing any testimony regarding Powell's cocaine level. The circuit court also informed defense counsel of its concerns:

THE COURT: ... And just so, you know, counsel, you're very clear, it's the Court's concern that Dr. Wong is not able to render an opinion that the victim was under the influence at the time of the shooting, and ... doesn't have enough information and that's what's stated on the bottom of page 5 of his opinion, and if that remains his opinion, then it's not admissible.

[DEFENSE COUNSEL]: I'm clear with that. Thank you, Your Honor. I'm clear as to the ruling.

THE COURT: Questionable relevancy and materiality will just create undue confusion.

Shortly before opening statements, the circuit court ruled, over the State's objection, that defense counsel could mention in his opening statement DeLeon's perception that Powell may have been "high on something without making any specifications." The cir-

6. HRE Rule 104 governs preliminary questions regarding the admissibility of evidence.

cuit court stated that the substance or the amount could not be mentioned "until we have had subsequent [HRE] Rule 104 hearings."

### 2. State's Case–in–Chief

At trial, Jermaine Beaudoin testified that on the night of July 30, 2009, he, along with Gamboa, and Powell went in Gamboa's Lincoln Navigator to Bar Seven[7] next to Ala Moana Center at about 2:15 to 2:30 a.m. Beaudoin estimated that at this point in the evening, he had consumed between nine to eleven alcoholic drinks, and that Powell had also been drinking but was not drunk. At some point, Beaudoin saw Powell talking to DeLeon, whom Beaudoin did not know at the time. Powell and DeLeon "got into a little tussle." Beaudoin intervened and DeLeon began yelling at him. In response, Beaudoin slapped DeLeon's head with his open hand, knocking off DeLeon's dark glasses. Beaudoin testified that he believed that DeLeon then left Bar Seven.

Beaudoin, Powell, and Gamboa then went in Gamboa's Navigator to Seoul Karaoke at about 3:45 a.m. Powell, Beaudoin, Gamboa and another acquaintance, Lane Akiona, walked in to Seoul Karaoke. The group was in Seoul Karaoke for about two to three minutes, was told that it was closing, and walked out to the car. According to Beaudoin, as the group walked to the car, someone yelled at them. Beaudoin stated that he "couldn't make out what he was yelling at us, but he was yelling something at us. So we turned around and walked towards the defendant." When Beaudoin came within about five to ten feet of DeLeon, Beaudoin "noticed that it was the same guy from Bar 7." At that point, Powell was closest to DeLeon, and Beaudoin told Powell "that's the guy from Bar 7[,]" and said "we go." According to Beaudoin, when Powell reached DeLeon, Powell said, "Everything is cool, everything—no more problem." Beaudoin described Powell's body language as "[r]egular, hands down. Everything is cool, misunderstanding or whatevers." Beaudoin stated that Powell did not look mad and that Powell

was trying to calm the situation. Powell was about an "[a]rm's length[ ]" from DeLeon when DeLeon then "[g]rab[bed] his gun and started shooting." DeLeon first shot into the ground two or three times, then shot Powell in the chest. At that point, Beaudoin was "turning around, trying to get away[,]" and then DeLeon shot "towards [Beaudoin] in the ground and [shot] at the vehicle." Beaudoin stated that as DeLeon shot the gun, Beaudoin was on the ground and "felt the pebbles off the ground hitting [his] face." Beaudoin testified that the shots were "[c]ontinuous[ ]."

On cross-examination, Beaudoin acknowledged that his July 31, 2009 written statement describing the incident reflected that DeLeon's first shots were in the air and that his written statement and his August 5, 2009 grand jury testimony did not mention that his group approached DeLeon because DeLeon yelled at them. Beaudoin stated that he tried to stop Powell by grabbing his shoulder and that he was able to stop him from walking. Beaudoin acknowledged that when asked before the grand jury how many feet away DeLeon was from Powell when DeLeon shot Powell in the chest, Beaudoin answered, "[n]ot feet" and "[n]ot even feet."

Gamboa testified that at Bar Seven, he noticed Powell talking to a Mexican man in dark glasses and that the conversation between them appeared friendly. At some point there was a commotion in the group, and Gamboa saw another acquaintance, Joe Chang, "trying to break it up [and p]ulled kind of [Powell] to the side." Gamboa did not see anyone being hit but saw "this Mexican guy stumbling." Gamboa saw the Mexican man walk towards the entrance of the club and did not see him in the club after that.

Later, the group left Bar Seven, and Gamboa drove Beaudoin, Powell, and two other men whom Gamboa did not know to Seoul Karaoke. No one talked about the incident from Bar Seven, and Powell "seemed normal[ ]" and "[n]othing bothered him."

---

7. Other witnesses, as well as defense counsel and the DPA, referred to this establishment as either Club 7 or Bar Seven. For purposes of consistency, this opinion will use the name "Bar Seven."

Gamboa further testified that he, Powell, Beaudoin, Lane, and two other men went to Seoul Karaoke but were told it was closed and left. Gamboa walked into the parking lot to his car, with the other men "kind of trailing behind" him. Gamboa opened his car door, and then heard someone yelling aggressively, "You want to mess with me? You want to hit me?" Gamboa then heard someone say, "What, the guy from Sevens." Gamboa turned around to see who was yelling and walked in the direction of the yelling. Gamboa saw "him coming towards us. Then he shot three rounds into the ground. . . . [T]hen I seen him shoot [Powell]." Gamboa estimated that one to two seconds passed between when he heard the man yelling and when he fired the first three shots into the ground, and stated that it was another one to two seconds between the first three shots and the shot to Powell. Gamboa stated that Powell and the man had been "kind of talking towards each other," but that Gamboa could not hear what they were saying. Gamboa stated that he saw the man point the gun towards Powell's chest and that Powell was raising his hands with his palms facing forward when the man shot Powell. About one to two seconds after shooting Powell, the man shot toward Gamboa. Gamboa heard his car windshield "blowing up[,]" and ran to the building next door. Gamboa stated that Powell was about one to two feet away from the shooter when he was shot. Gamboa identified the shooter in court as DeLeon.

On cross-examination, Gamboa acknowledged that he told police that DeLeon's car pulled up as the group left Seoul Karaoke, and Powell "veered off." Gamboa stated that he did not drink the night of the incident.

Lane Akiona testified that as he was leaving Seoul Karaoke with Powell, Beaudoin and Gamboa, a male Lane did not know approached them. Lane did not know about the incident with DeLeon at Bar Seven. According to Lane, the male said, "What's up?" When asked how the male was acting, Lane answered: "Like what's up now, like, then

[Powell] raised his hands approaching him and the guy reached behind his back and he just—it happened so fast. He just started firing shots and I ducked out of the way and tried to get out of the line of fire." Lane estimated it was about 15 to 20 seconds between when the male said, "what's up" to when he started shooting. Lane stated that before Powell was shot, Powell was "[j]ust standing there[.]" Lane stated that he saw the shooter point directly to Powell's chest when the shooter was about three feet from Powell. Lane identified the shooter in court as DeLeon.

Daekum Kim, who worked at Seoul Karaoke at the time of the incident, stated that at about 4:00 a.m. on July 31, 2009, he told a group of about four to five drunk men who entered that Seoul Karaoke would be closing. The men left, and Kim heard "someone fight" outside. Kim could not see who was outside, but "[t]heir voice was loud and the yelling and they say bad words." Kim then heard a single gun shot, then "after two, three seconds, two, three times more." Kim called the police and did not go outside until after the police arrived.

Liana Cuarisma, DeLeon's girlfriend at the time of the incident, testified that on July 31, 2009, at about 3:50 a.m., DeLeon called her and said, "I just got fucking mobbed"[8] at Bar Seven. Cuarisma stated that DeLeon sounded upset and was "[h]uffing and puffing" over the phone. Later that day, during lunchtime, DeLeon told Cuarisma over the phone that he had to return to Washington, where he was from, to see his mother in the hospital.[9] Later that evening, Cuarisma dropped DeLeon off at the airport.

Taro Nakamura, a Honolulu Police Department (HPD) homicide detective, testified that at some point he received an anonymous phone call from a male who said that Powell had gotten into an argument with someone at Bar Seven, and described the person as a tall Mexican male with the name of Jose Lion or

8. Cuarisma initially testified that DeLeon told her that he had just gotten "mugged."

9. Cuarisma, whom the State treated as a hostile witness, later acknowledged on direct examina-

tion that it was possible, although she did not remember, that between 4:08 a.m. and 9:30 p.m. on July 31, 2009 she talked to DeLeon at least 40 times.

Deleon.[10] Nakamura ran background checks for "combinations of Jose, Jesus, Lion, Deleon," found an entry and photograph for DeLeon, and assembled a photographic lineup. Beaudoin and Gamboa picked out DeLeon from the photographic lineup, but Lane was not able to identify a suspect. Nakamura learned that DeLeon had purchased an airplane ticket, and sent officers to the airport.[11]

HPD criminalist Kaleo Kaluhiokalani testified as an expert in the field of gunshot residue analysis and stated that gunshot residue kit samples taken from Powell's hands showed particles "highly specific to gunshot residue." Kaluhiokalani stated that this finding could indicate that Powell discharged a gun, handled the gun or another object contaminated with gunshot residue, or was near a firearm when it was discharged, and that if a person is shot in the chest and touches the wound, gunshot residue can be transferred to the person's hands.

Acting chief medical examiner Dr. William Goodhue, testifying as an expert in the field of forensic pathology, stated that he performed an autopsy on Powell on July 31, 2009 and concluded that Powell's cause of death was "massive blood loss due to injury to his heart as a result of a gunshot wound to the chest." On cross-examination, Dr. Goodhue stated that the gunshot to Powell was not a contact wound in which the barrel of the gun was placed against the body. Dr. Goodhue stated that he could not conclude how far away the gun was from Powell at the time it was fired because he did not receive Powell's shirt to examine.

After the State rested,[12] DeLeon moved for judgment of acquittal as to all charges. The circuit court denied the motion.

### 3. HRE Rule 104 hearing regarding cocaine evidence and circuit court ruling

On September 22, 2010, the day after resting its case-in-chief, the State filed Motion in Limine No. 2, seeking to exclude from trial (1) any evidence of any opinion by Dr. Wong regarding the behavioral effects of cocaine and/or alcohol combination, (2) any testimony about how Powell might have reacted to the cocaine and/or alcohol in his system, and (3) Dr. Wong's opinion in his September 7, 2010 letter[13] that:

Given[ ] the co-presence of significant levels of cocaine and alcohol in the decedent, my opinion is that [ ] Powell was under the influence of those two drugs at the time of the shooting, and accordingly, made a fatal misjudgment in his attempt to accost the defendant, [ ] Deleon, even after warning shots were fired.

The State argued that allowing such evidence would violate HRE Rule 702,[14] stating: "Dr. [ ] Wong cannot testify to [ ] Powell's state of mind because he does not have enough information. Additionally, it is an issue of fact for the jury to decide whether there was an 'attempt to accost the defendant.' Lastly, the opinion is outside Dr. Wong's expertise." The State also argued that Dr. Wong's "opinion is outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury," warranting its exclusion pursuant to HRE Rule 403.

The circuit court held an HRE Rule 104 hearing the same day. At the hearing, Dr. Wong testified that he is a forensic toxicologist and the toxicology lab director at Clinical

---

10. It appears that the anonymous call occurred on July 31, 2009.

11. Additional witnesses testified about DeLeon's check-in and arrest at the airport on the evening of July 31, 2009.

12. Additional witnesses testified for the State; however, their testimony is not relevant to the issues before this court.

13. Dr. Wong's September 7, 2010 letter is not included in the record on appeal.

14. HRE Rule 702 (1993) provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

Laboratories of Hawaii's toxicology department. Dr. Wong explained that cocaine is a "central nervous system stimulant ... [that] mimics the activity of adrenaline." Its effect increases the heart rate and dilates blood vessels, "engorg[ing] the muscles of the body to fight or flight[ ]"—that is, "when a person is confronted with danger or something that is opposing them, they would develop the ability to fight off that threat or to run away." Dr. Wong agreed that he could say "to a reasonable scientific probability that based on [his] training and experience, ... the ingestion of cocaine can affect someone's behavior[.]"

With respect to the instant case, Dr. Wong testified that he reviewed some parts of the police report, the testimony of the witnesses before the grand jury, witness statements to the police officers "investigating right after" the shooting, the medical examiner's report, and a security camera video recording of the shooting. Dr. Wong noted that Dr. Goodhue's autopsy report indicated the finding of cocaine and benzoylecgonine, a metabolite of cocaine, in Powell's blood. According to the medical examiner's laboratory report on Powell, "the alcohol was extremely high." A toxicology report indicated the presence of .05 milligrams per liter of cocaine and .39 milligrams per liter of benzoylecgonine. Dr. Wong stated that the proportion of benzoylecgonine to cocaine "generally means that the cocaine ... was perhaps consumed at a ... much earlier time frame, say beyond four or five hours." Dr. Wong noted that Dr. Goodhue's autopsy report stated that the cocaine was taken "in close proximity to the death"; Dr. Wong stated that given the level of cocaine detected, it was taken within the previous 24 hours. Dr. Wong also testified that he called the laboratory that performed the toxicology analysis on Powell's blood, and learned that the laboratory also found cocaethylene, which "indicates a usage of cocaine while there was still alcohol present in the body."

Defense counsel asked Dr. Wong if he could say to a "reasonable scientific probabil-

ity" that if cocaine is in the blood, it would have an effect on the user's behavior, to which Dr. Wong responded: "I would say not knowing his medical history, his experience with cocaine, I would say just if I would assume an average user or a naive user, yes, we would normally see the effects of cocaine."

Dr. Wong also performed a retrograde extrapolation for alcohol and cocaine, in which he calculated the concentrations of alcohol and cocaine in Powell's body at the time of the shooting. Dr. Wong stated that Powell's blood alcohol at the time of the shooting was 0.18.[15]

Dr. Wong stated that the combined effects of cocaine and alcohol "generally are additive, especially in the effects of judgment." The following exchange occurred between defense counsel and Dr. Wong:

Q. Does it help you at all in the video in assessing as you may look at a police report a field sobriety test, does this video help you at all in being able to give an opinion based on a reasonable scientific probability as to what the effects first of all with the alcohol and then—strike the alcohol, the effects of the cocaine?

A. Just that everyone else there at that party had drinks as well as he. When they saw or appeared to have seen a gun, they all pretty much stayed away from the defendant, whereas the victim did not. Now, what is the commonality of all of them? They had alcohol. What was the—at least all we know at this time the only difference between [ ] Powell and the others in his party was that we found cocaine in him, and so by inference perhaps it was that cocaine that gave him that extra shove to confront the individual.

Q. Can you say to a reasonable scientific probability the fact that there was cocaine found in his bloodstream, the proximity of the cocaine, that it affected his judgment and his critical judgment or his behavior, just the cocaine alone?

---

15. Although Dr. Wong did not state at the hearing the concentration of cocaine in Powell's blood at the time of the shooting, Dr. Wong's August 9, 2010 letter that defense counsel submitted to the circuit court on September 3, 2010 indicated that Powell's blood cocaine concentration at the time of the shooting was in a "probable range of 0.06 to 0.08 mg/L."

A. Well, again, just based on cocaine concentrations that is something I can't give you a definite answer but if this individual was approaching staring down the barrel of a gun, where most normal people would shy away or perhaps remove themselves from, I would say that perhaps cocaine, yes, by a probability would have been a factor in having him confront this individual even with a gun being presented towards him.

. . . .

Q. . . . Are you satisfied that the ingestion of cocaine in the proximity to the death had an impact on Powell's behavior?

A. With reasonable probability I would say yes.

Q. To a reasonable medical scientific probability?

A. Yes.

(Emphases added).

On cross-examination, the State questioned Dr. Wong about what he could testify to regarding the effect of cocaine on Powell:

Q. You know, you just used words like perhaps the cocaine could or would have been a factor in [ ] Powell's judgment; right?

A. Yes.

Q. And you cannot testify today in court under oath that to a reasonable degree of medical certainty [ ] Powell was under the influence of cocaine at the time of the shooting?

[DEFENSE COUNSEL]: Excuse me, I don't mean to interrupt you, . . . I'm not so sure the standard is medical certainty, I think it's probability but either way.

THE WITNESS: Yes.

BY [THE STATE]:

Q. Dr. Wong, you're uncomfortable with saying that; isn't that true?

A. Well, normally in court in a criminal case I usually would make an opinion based on beyond a reasonable doubt, okay? In this case it's clearly it's not beyond a reasonable doubt whether or not he was or not or was not under the influence of cocaine. I can only say with reasonable

probability because of the concentration that was found, extrapolated concentration that was found in the blood, as well as his behavior, his apparent behavior in the camera of moving towards the defendant—

. . . .

Q. Can you testify to a reasonable medical degree of certainty that [ ] Powell was under the influence of cocaine at the time of the shooting?

A. I can only say by probability.

Q. Yes or no, Doctor.

A. High probability, that's all I can say.

Q. High probability, not to a reasonable degree of medical certainty?

A. Not beyond a reasonable—

THE COURT: Scientific certainty.

BY [THE STATE]:

Q. Scientific certainty. To a reasonable degree of scientific certainty, can you testify that [ ] Powell was under the influence of cocaine at the time of the shooting?

A. No.

Q. And the reason why you can't is because you don't know the background of [ ] Powell?

A. Yes.

. . . .

Q. . . . . [Y]ou cannot testify to a reasonable degree of scientific study [sic] because you state you need more information?

A. Yes, that's correct.

Q. From your August 9 letter to your September 7 letter you say you need more information; correct?

A. Yes.

Q. Now, you need to know how the cocaine was ingested, was it smoked, was it snorted, was it intravenous?

A. No, that aspect was not important. Primarily the important factors were did the individual show signs of intoxication, and we have no evidence other than any anecdotal evidence from the other witnesses. The camera was too far away to really determine any behaviors of tremors or antsyness of the individual. Of course, you cannot determine the pupil dilation, so I can't use any other evidence to deter-

mine whether or not he was definitely under the influence of cocaine.

(Emphases added).

Dr. Wong acknowledged that in his September 7, 2010 letter, he cited to two references, including a "McCance–Katz" article—which studied the effects of cocaine and alcohol—but did not read that article. Dr. Wong stated that he relied primarily on an article by Dr. Eisenschmidt, and that he cited the McCance–Katz study because it was noted in the Dr. Eisenschmidt article.

Dr. Wong acknowledged that between his August 9, 2010 letter and his September 7, 2010 letter, he never received information regarding the total amount of cocaine Powell ingested and when it was ingested, which would be required to determine more accurately whether Powell was under the influence of cocaine at the time of the shooting. Dr. Wong also stated that he would need to know Powell's tolerance. When asked whether he received the information he requested, Dr. Wong responded: "Not all the information, no, that I needed. And I did say I could not make that statement that with reasonable—with medical certainty. I said I could not make that determination that he was under the influence of cocaine."

The circuit court also examined Dr. Wong:

Q. Dr. Wong, this last paragraph that [defense counsel] was just asking you about [in Dr. Wong's supplemental report dated September 7, 2010], the highly intoxicated by alcohol and cocaine, does the highly intoxicated modify both? I mean, was he highly intoxicated by cocaine at the time?

A. The highly intoxication would refer to the alcohol.

Q. Okay. And as the Court understands your first letter, you were not able to determine whether he was under the influence of the cocaine at the—

A. Well, I mention it was hard to make a definitive judgment on his impairment or the influence by cocaine unless there is more information given.

Q. And the additional information between August and September was your viewing of the video?

A. Yes, and the finding about the co-caethylene as well.

Q. And the effect of that was just to indicate that the cocaine and alcohol had been taken at the same time?

A. Yes.

Q. But did not give any additional information about amount, time of ingestion?

A. That, yes, we don't know but the fact that they were both then coincident in the blood would give a very high probable of circumstance of intoxication by both, okay? [sic] I don't have any behavioral clues other than perhaps what may be seen in the film of the man approaching the suspect with the—the defendant with the—I guess in their confrontation. It's difficult to see at what point the gun is brandished. You can't really pick that out in the film. So my point is that if a person points a gun at you it normally would give the person pause. I would not run up to him face-to-face if I see a gun in his hand.

Q. The chart that was attached to your August letter with regard to the level of alcohol intoxication and the behavior, is there a similar chart for cocaine?

A. No, for any of the drugs. That's the reason why the DRE program[16] was established because there is no definitive way you can give a level of drug with a level of impairment. Some drugs exert effects even as the levels are dropping, so they don't always correlate increase level increase intoxication either drugs as it does in alcohol. [Sic]

Following the questioning of Dr. Wong, defense counsel argued that Dr. Wong should be allowed to testify about the behavioral effects of cocaine:

... I think really it's a weight issue, if anything, based on whether [the jury] believe[s] that was a factor. It's ... impossible for any expert to be present unless it's a controlled test to watch somebody ingest any drug, cocaine included, and that's why

---

**16.** Dr. Wong described the DRE program as a certification program that trains officers to rec-

ognize impairment due to drugs rather than alcohol.

we have toxicology reports and that's why we have experts, forensic toxicologists, who testify regarding the accepted effects, behavioral effects, based on studies that are done. And when [the DPA] asked [Dr. Wong] whether or not there's anything in his references or CV, it is there. He has testified before and been admitted as an expert for the effects. It's the combined effects. And I think he certainly shouldn't be precluded and the jury should not be misled as to the condition of [ ] Powell. I think his testimony is an aid to the trier of fact. I think there's a sufficient basis based on his credentials, based on the toxicology report, based on his extrapolation, and if it does enhance the effects of alcohol they should know that. And I think it would be properly admitted. I think it would be error to exclude it. . . .

(Emphasis added).

The circuit court allowed Dr. Wong's testimony as to the effects of alcohol, but excluded his testimony regarding cocaine:

Viewing the evidence that has been presented with respect to this issue, the Court affirms its prior ruling on the motion in limine, is going to preclude the evidence and testimony with respect to the presence of cocaine.[17]

The Court, in reviewing Dr. Wong's initial letter, the subsequent September letter, as well as the testimony presented today, the Court thinks that it does not have sufficient reliability to present the issue before the jury and is going to cause confusion. The Court does note that in the [August] letter he indicated that he was not able to render an opinion with respect to whether [ ] Powell was under the influence of cocaine at the time of the shooting without additional information. He received some additional information between August and September, not the specific information that he indicated that he would need to do that, and he further indicated today that he could not make the—render an opinion to a reasonable

degree of scientific certainty that [ ] Powell was under the influence of cocaine at the time of his—at the time of the shooting and therefore to allow him to opine about influence of both substances and the effect on the behavior of the deceased would be speculative. So Court precludes that use.

. . . .

[Dr. Wong] could not give an opinion in August and then he did render that opinion in the September 7th letter, but the Court is not allowing that opinion based on the testimony presented this morning. And he did indicate this morning that he cannot render that opinion to a reasonable degree of scientific certainty.

But just to clarify . . ., he will be able to testify as to the blood alcohol level at the time of the shooting and what that level blood alcohol may indicate in terms of an individual's behavior. The Court does find he's qualified in that area.

(Emphases added).

### 4. Defense's Case–in–Chief

Chang testified that he met DeLeon through a mutual friend and saw DeLeon about four or five times at various bars before the night of the incident. DeLeon appeared to be at Bar Seven alone and was drinking. At some point, DeLeon wound up talking with Powell. Chang, who considered Powell a friend, testified that Powell had his arm around DeLeon "like how you would hold like a pal or a buddy[,]" but Chang could not hear what Powell was saying to DeLeon. Beaudoin then told Chang he wanted to "false crack the Mexican guy[,]" and Chang told Beaudoin, "The guy is not doing anything wrong. Leave him alone. They're all right." Chang turned to talk to someone else, and then heard a slap. DeLeon started yelling at Beaudoin, "[W]hat the hell are you doing?" Chang "stopped the confrontation[,]" picked up DeLeon's glasses from the floor, returned them, and told DeLeon, "You need to get the hell out of here before some-

---

**17.** It is unclear from the record whether the circuit court actually made a prior ruling on this issue. A transcript of the September 3, 2010 hearing indicates that the circuit court's prior ruling was that an HRE Rule 104 hearing would be held prior to any admission of the cocaine evidence. Minutes of the September 3, 2010 hearing state: "State and Deft's motions in limine: granted in part, reserved in part, and Rule 104 hearings to be held."

thing worse happens to you[,]" because "they have all their friends[.]" DeLeon then left the club. About half an hour later, Chang left the club and went to Seoul Karaoke, where he saw Powell and Powell's group. Chang left Seoul Karaoke before Powell was shot.

Dr. Wong was qualified as an expert witness in the field of forensic toxicology, and testified that he reviewed the Sorabol security video, Powell's autopsy report, and a toxicology report of Powell's blood alcohol content. Dr. Wong stated that Powell was found to have a blood alcohol level of 0.171, which indicates "a high degree of alcohol intoxication." Dr. Wong further stated that he calculated by retrograde extrapolation that Powell's blood alcohol level was .181 at the time of the shooting. Dr. Wong then consulted the "Dubowski table"[18] in which ranges of blood alcohol concentrations are assigned various stages of alcoholic influence and clinical signs and symptoms. According to the Dubowski table, Powell's blood alcohol level bordered between the alcoholic influence categories of confusion and excitement. Dr. Wong also testified that the category of euphoria, which included symptoms of being "supremely overconfident[,]" was also applicable. Dr. Wong explained that the category of "excitement" includes symptoms of emotional instability and impairment of the perception of distance, objects, and danger. Dr. Wong explained the category of confusion as

> not being situationally aware of where you are in a given time.... [I]f you have mental confusions you may not be aware of these different options ... that were available to you and you may take other options that are perhaps more dangerous. It also is a means of interpretation of what the situation is. If a person is in conversation or in actions that may be misinterpreted as something else.
>
> . . . .
>
> [I]f a person is angry at an individual, alcohol will supplement and will fuel that

anger to a higher level, in some cases rage, uncontrollable rage.

After the defense rested,[19] DeLeon moved for judgment of acquittal, which the circuit court denied.

### 5. Jury instruction on self-defense

The circuit court provided the jury an instruction modeled after HAWJIC 7.01 with regard to self-defense. The instruction provided the following:

> Justifiable use of force, commonly known as self-defense, is a defense to the charge of Attempted Murder in the First Degree in Count I and Murder in the Second Degree in Count II and the included offense in Count II of Manslaughter. The burden is on the Prosecution to prove beyond a reasonable doubt that the force used by the defendant was not justifiable. If the Prosecution does not meet its burden, then you must find the defendant not guilty.
>
> The use of force upon or toward another person is justified when a person reasonably believes that such force is immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person. The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.
>
> The use of deadly force upon or toward another person is justified when a person using such force reasonably believes that deadly force is immediately necessary to protect himself on the present occasion against death or serious bodily injury. The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under

---

18. Dr. Wong testified that the table was constructed by Dr. Kurt Dubowski, a "world expert on alcohol."

19. DeLeon chose not to testify. Additional witnesses testified for the defense; however, their testimony is not relevant to the issues before this court.

the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.

The use of deadly force is not justifiable if the defendant, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter or if the defendant knows that he can avoid the necessity of using such force with complete safety by retreating.

"Force" means any bodily impact, restraint, or confinement or the threat thereof.

"Unlawful force" means force which is used without the consent of the person against whom it is directed and the use of which would constitute an unjustifiable use of force or deadly force.

"Deadly force" means force which the actor uses with the intent of causing, or which he knows to create a substantial risk of causing, death or serious bodily injury.

Intentionally firing a firearm in the direction of another person or in the direction which the person is believed to be constitutes deadly force.

A threat to cause death or serious bodily injury by the production of a weapon or otherwise, so long as the actor's intent is limited to creating an apprehension that he will use deadly force if necessary, does not constitute deadly force.

"Bodily injury" means physical pain, illness, or any impairment of physical condition.

"Serious bodily injury" means bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

If and only if you find that the defendant was reckless in having a belief that he was justified in using self-protective force against another person, or that the defendant was reckless in acquiring or failing to acquire any knowledge or belief which was material to the justifiability of his use of force against the other person, then the use of such self-protective force is unavail-

able as a defense to the offense of Manslaughter.

The defense did not object to the court's self-defense instruction.

### 6. Closing arguments

In its closing argument, the State described DeLeon as a person with various VIP cards to bars and nightclubs and "who thinks he's somebody, he's a baller, he's a VIP." The DPA stated that that image was "crushed" on the night of the incident at Bar Seven, when Beaudoin slapped him, and DeLeon was told to "get the hell out of here[,]" leaving DeLeon to "do the walk of shame in front of all these guys[.]" The DPA stated that DeLeon, humiliated, "waited to see which car they got into, he waited to see where they would go, and he waited for his opportunity."

The DPA stated that DeLeon arrived at Seoul Karaoke two minutes after Powell's group walked into Seoul Karaoke—"one hour, seven minutes, and 55 seconds after the slap." The DPA stated that DeLeon waited "in the dark, and watch[ed] as [Powell] and his friends walk from Seoul directly to the Navigator[.]" DeLeon then "shout[ed] out to them, You wanna mess with me? You wanna hit me? What's up now? He's trying to, and he does, get the attention of [Powell] and his friends." The DPA described what occurred next as follows:

> So at 04:09:07 A.M. you see [Powell] turn and walk towards that shouting. They walk towards him, . . . listening to this shouting and screaming, wondering what's going on, when they finally realize, when they get closer, Oh, it's the guy from [Bar Seven]. So [Beaudoin] tells him, Nah, let's just go. But [Powell] tells him, No, brah, everything's cool. He has his hands up. Everything's cool. It doesn't stop the defendant. First three shots. . . .
>
> Meanwhile, [Powell] is still there, hands up, I surrender; It's okay; Everything's cool. He doesn't kick him; he doesn't punch him; he doesn't slap him; he doesn't choke him; he doesn't lunge at him; he doesn't threaten him. But it doesn't matter. Shot four, less than three feet away, Defendant points, aims, and

shoots. [Powell] crumbles. And at this point, he doesn't lower the gun to shoot to his leg; he doesn't raise the gun to shoot to his shoulder or his foot. Straight to the heart.

The DPA also argued that self-defense did not apply to DeLeon:

You cannot create your own thing, walk up to it, and then claim self-defense. He calls them over. He says, Come over here; Look what I gotta show you. Shawn walks up with his hands. When he realizes who it is, Everything's cool, brah. You know, nothing. I'm in surrender, palms face up. He doesn't hit him; he doesn't punch him; he doesn't kick him; he doesn't threaten him.

In his closing argument, defense counsel stated that DeLeon did not want to shoot anyone but ended up shooting Powell in self-defense. Defense counsel questioned the State's theory that DeLeon was seeking revenge, noting that DeLeon did not shoot Beaudoin, who slapped him at Bar Seven, but shot Powell, "the guy that was on him, that walked across and ignored the warning shots, ignored his friend who tried to grab him, and he was on him."

[T]here's a gun at [DeLeon's] side, and they start coming. They're screaming and yelling. And then there's finally, when he's five feet away, a gunshot in the air. [Powell's] friends are trying to pull him off. He's less than a foot away. His hands, I suggest, are out and he shot once. Was there a reasonable belief that he was going to sustain serious bodily injury? Is there anyone that can possibly imagine some crazy guy, drunk, coming at you and you firing a warning shot? If he wants to shoot somebody, what's he firing warning shots about? Why does he then shoot in the ground to keep the other guys back? He wants to kill somebody? He thought about it? How could anyone right-thinking not believe that he has a reasonable belief he's going to suffer serious bodily injury when the guy is now on him after he's fired a warning shot? And you'll see [DeLeon] steps out of the screen. He steps back. But [Powell is] on him. And

he doesn't listen to Beaudoin, who's grabbing his shoulder.

Defense counsel described Powell as "one mean guy when he got drunk," and called Powell's group a "mob looking for trouble, going after a guy with a gun, who's firing a warning shot." Defense counsel stated that on the night of the shooting, Powell and his friends were "drunk out of their minds" after engaging in "eight hours of drinking alcohol." Defense counsel noted that Powell's extrapolated blood alcohol level was 0.181 and that "Dr. Wong said the presumption of intoxication is 0.82, [sic] which is twice the amount, which fits into every category almost of the Dubowski table." Defense counsel further discussed Dr. Wong's testimony regarding the effects of alcohol on Powell:

[W]e have increased self-confidence, decreased inhibitions, diminished judgment and control, emotional instability, critical judgment, Superman. Bullets don't hurt you. Critical judgment, impairment of perception.... This guy ... has lost his critical judgment and it increases his rage. To suggest to you folks he just walked across the parking lot—and you'll see it—just to say, Braddah, everything is cool, my hands are up, you see, I surrender—who are the other two people that were screaming and swearing in that parking lot? Braddah, it's so cool. How come Beaudoin had to try to grab him by the shoulder and couldn't do it?

## G. Verdict, Judgment, and Sentence

On October 1, 2010, the jury found DeLeon guilty of Murder in the Second Degree as to Powell (Count II), Carrying or Use of a Firearm While Engaged in the Commission of a Separate Felony (Counts IV and V), Place to Keep a Pistol or Revolver (Count VI), Reckless Endangering in the First Degree (Count VII), and Ownership or Possession Prohibited of Any Firearm or Ammunition by a Person Convicted of Specified Crimes (Count VIII). The jury found DeLeon not guilty of Attempted Murder in the Second Degree as to Gamboa (Count III), but found him guilty of the included offense of Reckless Endangering in the First Degree. The jury acquitted DeLeon of At-

tempted Murder in the First Degree regarding Powell and Gamboa (Count I).

At sentencing, the circuit court granted the State's oral motion to dismiss without prejudice Count VI, which merged with Count VIII. DeLeon was sentenced to concurrent prison terms of life with the possibility of parole (Count II), five years (Count III), twenty years (Count IV), twenty years (Count V), five years (Count VII), and ten years (Count VIII). DeLeon was also sentenced to mandatory minimum terms of twenty years for Count II and five years for Count III, and was ordered to pay $4,000 in restitution to the Crime Victim Compensation Commission. DeLeon timely filed a notice of appeal.

## B. ICA Appeal

In his opening brief, DeLeon raised four points of error. Specifically, DeLeon asserted that (1) defense counsel provided ineffective assistance of counsel by failing to establish Powell's recent cocaine ingestion before the incident, (2) the circuit court's self-defense instruction failed to properly instruct the jury on the law of self-defense, (3) the circuit court erroneously refused to instruct the jury on extreme mental or emotional disturbance (EMED) manslaughter, and (4) the circuit court wrongly convicted and sentenced him as to Count V (Carrying or Use of Firearm in the Commission of a Separate Felony) because the jury convicted him in Count III of reckless endangerment, an excluded offense.[20]

In its January 18, 2013 Summary Disposition Order, the ICA agreed that DeLeon's conviction as to Count V was improper because his reckless endangerment conviction did not constitute a "separate felony," and accordingly reversed the Count V conviction.

The ICA affirmed the circuit court's judgment in all other respects. Relevant to the issues before this court, the ICA rejected DeLeon's ineffective assistance of counsel argument, and concluded that the circuit court properly instructed the jury on self-defense. The ICA filed its judgment on appeal on February 14, 2013.

DeLeon timely filed his application for a writ of certiorari, in which he raises the following questions:

1. Whether the ICA gravely erred in rejecting DeLeon's claim that counsel was ineffective for failing to establish [decedent Shawn] Powell's cocaine ingestion (in addition to his alcohol intoxication) which substantially impaired DeLeon's defense of self-defense.

2. Whether the ICA gravely erred in rejecting DeLeon's claim that the self-defense instruction based on HAWJIC 7.01, which omitted the language of HRS § 703-304(3), failed to completely and properly instruct the jury on the law of self-defense.

The State filed a response on April 22, 2013.[21]

## III. Standards of Review

### A. Ineffective Assistance of Counsel

 When reviewing a claim of ineffective assistance of counsel, this court looks at whether defense counsel's assistance was within the range of competence demanded of attorneys in criminal cases. The defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judg-

---

20. HRS § 134–21 (Supp.2009), which governs the offense of Carrying or Use of a Firearm in the Commission of a Separate Felony, provides, in relevant part:

(a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, ... provided that a person shall not be prosecuted under this subsection when the separate felony is:

. . . .

(2) The felony offense of reckless endangering in the first degree under [HRS § ] 707–713[.]

21. On May 22, 2013, this court accepted DeLeon's application and ordered supplemental briefing regarding the degree of certainty required for admission of scientific expert testimony in criminal cases. The parties filed supplemental briefs on this issue on June 25, 2013.

ment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense. To satisfy this second prong, the defendant needs to show a possible impairment, rather than a probable impairment, of a potentially meritorious defense. A defendant need not prove actual prejudice.

*State v. Wakisaka,* 102 Hawai'i 504, 513–14, 78 P.3d 317, 326–27 (2003) (internal quotation marks, citations, and footnote omitted).

▮ The proper standard for claims of ineffective assistance of counsel on appeal is whether, "viewed as a whole, the assistance provided was within the range of competence demanded of attorneys in criminal cases." *Dan v. State,* 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994) (internal quotation marks, citation, and brackets omitted).

General claims of ineffectiveness are insufficient and every action or omission is not subject to inquiry. Specific actions or omissions alleged to be error but which had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny. If, however, the action or omission had no obvious basis for benefitting the defendant's case and it "resulted in the withdrawal or substantial impairment of a potentially meritorious defense," then it will be evaluated as information that an ordinarily competent criminal attorney should have had.

*Id.* (ellipses and brackets omitted) (emphasis in original) (quoting *Briones v. State,* 74 Haw. 442, 462–63, 848 P.2d 966, 976 (1993)). "[M]atters presumably within the judgment of counsel, like trial strategy, will rarely be second-guessed by judicial hindsight." *State v. Richie,* 88 Hawai'i 19, 39–40, 960 P.2d 1227, 1247–48 (1998) (internal quotation marks and citation omitted) (emphasis in original).

**B. Jury instructions**

The standard of review for jury instructions that were not objected to at trial was clarified in *State v. Nichols,* 111 Hawai'i 327, 141 P.3d 974 (2006), where the Hawai'i Supreme Court held that

although as a general matter forfeited assignments of error are to be reviewed under [Hawai'i Rules of Penal Procedure (HRPP)] Rule 52(b) plain error standard of review, in the case of erroneous jury instructions, that standard of review is effectively merged with the HRPP Rule 52(a) harmless error standard of review because it is the duty of the trial court to properly instruct the jury. As a result, once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt.

*Id.* at 337, 141 P.3d at 984 (footnote omitted).

▮ Thus, the appellant must first demonstrate instructional error by rebutting the "presumption that unobjected-to jury instructions are correct." *Id.* at 337 n. 6, 141 P.3d at 984 n. 6; *accord State v. Eberly,* 107 Hawai'i 239, 250, 112 P.3d 725, 736 (2005). If the appellant is able to rebut this presumption, the burden shifts to the State to prove that the error was harmless beyond a reasonable doubt because

[e]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. However, error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled.

*Nichols,* 111 Hawai'i at 334, 141 P.3d at 981 (brackets in original omitted) (quoting *State v. Gonsalves,* 108 Hawai'i 289, 293, 119 P.3d 597, 601 (2005)). If the State cannot demonstrate that the error was harmless beyond a reasonable doubt, the conviction must be vacated. *Nichols,* 111 Hawai'i at 337, 141 P.3d at 984.

**C. Plain Error**

Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the

attention of the court." Therefore, an appellate court "may recognize plain error when the error committed affects substantial rights of the defendant." *State v. Staley*, 91 Hawai'i 275, 282, 982 P.2d 904, 911 (1999) (citation omitted).

The appellate court "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *Nichols*, 111 Hawai'i at 334, 141 P.3d at 981 (quoting *State v. Sawyer*, 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998)). An appellate court's "power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." *Nichols*, 111 Hawai'i at 335, 141 P.3d at 982 (quoting *State v. Kelekolio*, 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993)).

### D. Admission of Expert Testimony

"Generally, the decision whether to admit expert testimony rests in the discretion of the trial court. To the extent that the trial court's decision is dependent upon interpretation of court rules, such interpretation is a question of law, which [the appellate] court reviews de novo." *Barcai v. Betwee*, 98 Hawai'i 470, 479, 50 P.3d 946, 955 (2002) (citations omitted).

### IV. Discussion

### A. The circuit court's ruling to exclude Dr. Wong's testimony regarding cocaine use by Powell

DeLeon argues on appeal that trial counsel provided ineffective assistance of counsel by committing errors that resulted in the circuit court's exclusion of testimony regarding Powell's cocaine level at the time of the shooting. As set forth below, DeLeon has failed to establish that his trial counsel was ineffective with regard to this issue. However, upon examination of the merits of the circuit court's ruling, we find that the circuit

court plainly erred in excluding such testimony. As stated supra, Dr. Wong was prepared to testify that, to a reasonable degree of scientific probability, Powell was under the influence of cocaine at the time of the shooting. However, the circuit court excluded the testimony because Dr. Wong could not testify to a "reasonable degree of scientific certainty." (Emphasis added).

Although trial courts may exclude expert testimony that is speculative in nature, expert opinions need not be based on a "reasonable degree of scientific certainty" in order to be admissible. Accordingly, we hold that the circuit court plainly erred in excluding the expert testimony at issue.

### 1. DeLeon's ineffective assistance of counsel claim fails

DeLeon argues that the ICA erred in rejecting his claim that his trial counsel was ineffective for "failing to establish Powell's cocaine ingestion[.]" Specifically, DeLeon argues that his trial counsel was ineffective by committing two specific errors: (1) failing to move the court to rule on the admission of the cocaine evidence at least in advance of Dr. Goodhue's testimony, and (2) failing to, during the HRE Rule 104 hearing, direct Dr. Wong to present his retrograde cocaine extrapolations and explain his opinion that Powell was affected by the cocaine. As set forth below, DeLeon's claim lacks merit.

To succeed on his claim of ineffective assistance of counsel, DeLeon must show that "there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence" and that "such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *Wakisaka*, 102 Hawai'i at 514, 78 P.3d at 327. With respect to his first contention, DeLeon has not demonstrated that trial counsel's failure to seek a ruling on the admission of the cocaine evidence prior to Dr. Goodhue's testimony constitutes ineffective assistance. DeLeon's argument appears to depend on the assumption that holding an HRE Rule 104 hearing in advance of Dr. Goodhue's testimony would have resulted in the admission of the cocaine evidence. However, DeLeon does not point to any part of

the record that supports such a result. As stated above, the circuit court ruled before trial that it would not allow any evidence about Powell's cocaine level until an HRE Rule 104 hearing, noting its concern that Dr. Wong stated he did not have enough information to opine that Powell was under the influence at the time of the shooting. After the HRE Rule 104 hearing, the circuit court excluded the cocaine evidence, stating that Dr. Wong could not state with a reasonable degree of scientific certainty that Powell was under the influence of cocaine. Dr. Wong stated at the hearing that to make such a determination, he needed more information, such as Powell's tolerance level, the amount of cocaine Powell ingested, and when he ingested it. DeLeon has not alleged that Dr. Goodhue could have provided such additional information. Cf. Richie, 88 Hawaiʻi at 39, 960 P.2d at 1247 ("Ineffective assistance of counsel claims based on the failure to obtain witnesses must be supported by affidavits or sworn statements describing the testimony of the proffered witnesses."). Indeed, DeLeon has neither offered any clear reasons nor pointed to any parts of the record that indicate that the timing of the HRE Rule 104 hearing was at all consequential. For these same reasons, to the extent that DeLeon argues that holding the HRE Rule 104 hearing after Dr. Goodhue testified prevented Dr. Goodhue from being cross-examined about the cocaine findings in his autopsy report, this argument fails.[22]

DeLeon's argument regarding trial counsel's "failure ... to direct Dr. Wong to present his retrograde cocaine extrapolations and explain his opinion that Powell was impacted" by cocaine during the HRE Rule 104 hearing also lacks merit. The record shows that defense counsel brought Dr. Wong's retrograde cocaine extrapolations to the attention of the circuit court. Defense counsel had presented Dr. Wong's cocaine extrapolations to the circuit court on September 3, 2010 through Dr. Wong's August 7, 2010 letter. Defense counsel also referenced the

extrapolation in his arguments during the September 22, 2010 HRE Rule 104 hearing; indeed, defense counsel argued, inter alia, that "there's a sufficient basis based on [Dr. Wong's] credentials, based on the toxicology report, based on his extrapolation[.]" Finally, in explaining its ruling, the circuit court noted that it reviewed, inter alia, Dr. Wong's "initial letter[.]" The initial letter included Dr. Wong's retrograde extrapolation figures.

Accordingly, the ICA did not err in rejecting DeLeon's ineffective assistance of counsel claim.

## 2. The circuit court plainly erred in excluding Dr. Wong's testimony regarding Powell's cocaine use

HRE Rule 702, which governs the admissibility of expert testimony, provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

HRE Rule 702 does not require a specific degree of certainty for the admission of scientific or other expert testimony. This court has stated that "the touchstones of admissibility for expert testimony under HRE Rule 702 are relevance and reliability." State v. Vliet, 95 Hawaiʻi 94, 106, 19 P.3d 42, 54 (2001). The relevance prong "primarily stems from the precondition ... that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue." Id. (citation and quotation marks omitted). The reliability prong "refers to evidentiary reliability-that is trustworthiness." Id. (citation and quotation marks omitted). Under the reliability factor,

---

22. Moreover, Dr. Goodhue was included in DeLeon's witness list, and if the circuit court had ruled that the cocaine evidence was admissible following the September 22, 2010 HRE Rule 104 hearing, DeLeon arguably could have called Dr.

Goodhue to testify about any cocaine findings. In other words, the timing of the HRE Rule 104 hearing alone did not preclude the defense from questioning Dr. Goodhue about any cocaine evidence.

admission of expert evidence "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his [or her] discipline." *Id.* (citation omitted) (brackets in original). "Generally, the decision whether to admit expert testimony rests in the discretion of the trial court." *State v. Metcalfe,* 129 Hawai'i 206, 222, 297 P.3d 1062, 1078 (2013) (citation omitted). "An abuse of discretion occurs when the decisionmaker 'exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.' " *Vliet,* 95 Hawai'i at 108, 19 P.3d at 56 (quoting *In re Water Use Permit Applications,* 94 Hawai'i 97, 183, 9 P.3d 409, 495 (2000)).

This court has stated, in civil cases, that medical opinions must be based on reasonable medical probability. In *Miyamoto v. Lum,* 104 Hawai'i 1, 15–16, 84 P.3d 509, 523–24 (2004), which involved, inter alia, a negligence action against a chiropractor, this court stated that a "plaintiff may solicit opinions from medical experts, but such medical opinions 'must be grounded upon reasonable medical probability as opposed to a mere possibility because possibilities are endless in the field of medicine.' " The *Miyamoto* court further stated that

> [T]he plaintiff's medical expert may be cross-examined as to "(1) the witness' qualifications, (2) the subject to which the witness' expert testimony relates, and (3) the matter upon which the witness' opinion is based and the reasons for the witness' opinion," as well as "the underlying facts or data [of the medical opinion]." After all, "[e]xpert testimony is not conclusive and like any testimony, the jury may accept or reject it."

*Id.* at 16, 84 P.3d at 524 (internal citations omitted); *see also Craft v. Peebles,* 78 Hawai'i 287, 305, 893 P.2d 138, 156 (1995) (holding, in a negligence case, that it was proper to instruct the jury to disregard any medical opinion "that was not based upon reasonable medical probabilities" (emphasis added)).

Because the HRE are patterned on the Federal Rules of Evidence, this court has looked to federal cases for guidance. *Vliet,* 95 Hawai'i at 105, 105 n. 20, 19 P.3d at 53, 53

n. 20 (stating that "because the HRE are patterned on the [FRE], construction of the federal counterparts of the HRE by the federal courts is instructive" and that "federal case law on FRE Rule 702 may be instructive regarding our construction of HRE Rule 702"). At least some federal courts have expressly rejected the proposition that a "reasonable degree of scientific certainty" is required for the admission of expert testimony.

In *United States v. Mornan,* 413 F.3d 372, 376, 381 (3d Cir.2005), the Third Circuit Court of Appeals considered the defendant's challenge to the admissibility of a handwriting expert's testimony where, when asked whether her opinions were rendered to a "reasonable degree of scientific certainty," the expert answered, "I think they are." The Third Circuit noted that the expert had "explained her qualifications, her methodology, the bases for her conclusions, and the degrees of certainty with which she was able to reach her conclusions," and that

> there is nothing magical about the phrase, "to a reasonable degree of scientific certainty." It is not derived from the language of Rule 702 itself, and this Court has been unable to find any authority to support the position that questions regarding the expert's "degree of scientific certainty" categorically renders expert testimony inadmissible.

*Id.* at 381 (internal citation omitted).

The court noted that "[h]andwriting experts often given their opinions in terms of probabilities rather than certainties." *Id.* The court therefore found that the trial court did not err in allowing the expert's testimony and "to allow the jury to determine what weight to give her 'less-than-certain' conclusions." *Id.*

Similarly, the Seventh Circuit Court of Appeals rejected the argument that the trial court erroneously admitted expert testimony that hair recovered from items used in a robbery were "microscopically like" hair samples taken from the defendants, which meant that the hairs found from the robbery "could have come" from the defendants. *United States v. Cyphers,* 553 F.2d 1064,

1071–73 (7th Cir.1977). The defendants argued that such testimony was inadmissible because, inter alia, it was not based on a reasonable scientific certainty. *Id.* at 1072–73. The Seventh Circuit rejected the defendants' argument, stating that "[t]here is no such requirement" that an expert's opinion testimony be expressed in terms of reasonable scientific certainty in order to be admissible, and that "[w]e adhere to the rule that an expert's lack of absolute certainty goes to the weight of his testimony, not to its admissibility." *Id.*

At least some state courts appear to use the terms "certainty" and "probability" interchangeably[23] and favor admissibility of expert testimony under either standard while disfavoring the admission of evidence based on speculation or possibility. *See State v. Freeman,* 223 N.J.Super. 92, 538 A.2d 371, 384 (N.J.Super.Ct.App.Div.1988) ("Medical expert testimony must be couched in terms of reasonable medical certainty or probability; opinions as to possibility are inadmissible." (citation and quotation marks omitted)); *Floray v. State,* 720 A.2d 1132, 1136 (Del. 1998) ("Generally when an expert offers a medical opinion it should be stated in terms of 'a reasonable medical probability' or 'a reasonable medical certainty.'").

At least some other states have expressly rejected the notion that expert testimony must be grounded in reasonable scientific certainty to be admitted. For example, the Supreme Court of Rhode Island has held that "scientific certainty" is not required to admit expert testimony. *State v. Gardner,* 616 A.2d 1124, 1129 (R.I.1992). In *Gardner,*

the trial court precluded an expert from testifying whether the defendant suffered from a mental defect at the time of the offenses, expressing "concern over the difficulty and potential unreliability of a retroactive diagnosis." 616 A.2d at 1126, 1129. The Supreme Court of Rhode Island held that the trial court erred, stating that although such a retroactive diagnosis "is an elusive undertaking" and that "[i]n a meta-physical sense it may be impossible to know the mental state of the defendant at the time of the criminal conduct[,] [a]bsolute scientific certainty ... is not the standard for the admissibility of expert testimony." *Id.* at 1129. The court stated that the trial court should have addressed such concerns by allowing the prosecutor to question this testimony on cross-examination. *Id.; see also State v. Bertram,* 591 A.2d 14, 24–25 (R.I.1991) (holding that the trial court did not err in admitting a document examiner's testimony about a signature when the examiner was not able to identify the signature to a reasonable degree of scientific certainty, stating that defense counsel had "ample opportunity" to cross-examine the witness "on his conclusions and emphasize any infirmities pertaining to his analysis" and that "[t]he jury could then decide what weight, if any, should be accorded to the testimony").

In *Robinson v. United States,* 50 A.3d 508, 514 (D.C.2012), the criminal defendants contended that they were prejudiced by the trial court's exclusion of expert testimony regarding the effects that the complaining witness's phencyclidine (PCP) use may have had on the accuracy of her perceptions. The trial

---

**23.** *See, e.g., State v. Benner,* 40 Ohio St.3d 301, 533 N.E.2d 701, 714 (1988) ("In this jurisdiction, an expert opinion is competent only if it is held to a reasonable degree of scientific certainty. In this context, 'reasonable certainty' means 'probability.'" (citation omitted)); *State v. Vernes,* 331 Mont. 129, 130 P.3d 169, 173 (2006) ("Expert testimony of the type proposed here may not be admitted ... unless it satisfies the 'reasonable medical certainty' test. This Court has defined the reasonable medical certainty test in terms of probabilities as 'more likely than not.'"); *State v. Shepherd,* 110 Wash.App. 544, 41 P.3d 1235, 1238 (2002) ("Expert testimony should express 'a reasonable probability rather than mere conjecture or speculation.' ... [I]n the criminal case, expert testimony on a person's mental status is

not admissible unless the expert's opinion is based on reasonable medical certainty, which is the equivalent of more likely than not." (citations and some internal quotation marks omitted)).

Using "certainty" and "probability" interchangeably appears consistent with Black's Dictionary, which defines "reasonable medical probability" as follows: "In proving the cause of an injury, a standard requiring a showing that the injury was more likely than not caused by a particular stimulus, based on the general consensus of recognized medical thought.—Also termed reasonable medical certainty." *Black's Law Dictionary* 1380 (9th ed. 2009) (emphasis added). However, in the instant case, it is clear that the circuit court did not use the terms "probability" and "certainty" interchangeably.

court excluded expert testimony on untimeliness grounds and because the expert was not able to "give an opinion within a <u>reasonable degree of scientific certainty</u> that 15 to 20 hours [after using PCP, the complaining witness's] ability to see, perceive, recall, understand were significantly affected by her use of PCP[.]" *Id.* at 518 (emphasis added) (some brackets in original).

On appeal, the Court of Appeals stated that "[a] trial court may exclude outright speculation, but short of speculation, a particular expert witness's degree of certainty in proffering an opinion goes to the weight of the testimony, not its admissibility, and 'the weight to be given an expert opinion is for the jury to decide.'" *Id.* at 523 (citation omitted). The Court of Appeals viewed the trial court's ruling as a "question of the basic relevance of the proffered testimony and whether it would assist the jury in understanding the facts in issue." *Id.* at 524. The Court of Appeals stated that the proffered expert testimony "could have lent credence to [the defendants'] contention that PCP could substantially hinder a witness's ability to perceive and remember events many hours later." *Id.* at 527. The Court of Appeals held, therefore, that excluding the testimony because the expert could not specifically say how PCP affected the complaining witness "misapprehended the purpose for which the evidence was offered and ran afoul of our case law indicating that expert testimony 'should generally be admitted if it will assist the jury to understand the facts in issue.'" [24] *Id.* at 527–28.

■ In light of the foregoing authorities, we conclude that trial courts should not require a "reasonable degree of scientific certainty" before admitting expert opinions but may exclude expert testimony based on speculation or possibility. *Cf. Miyamoto,* 104 Hawai'i at 15–16, 84 P.3d at 523–24.

■ The State appears to concede that a reasonable degree of scientific certainty is not required for the admission of scientific expert testimony. However, the State argues that the circuit court did not plainly err in excluding Dr. Wong's cocaine testimony because the circuit court had sufficient basis for finding that his testimony "lack[ed] sufficient reliability and was going to cause confusion without considering Dr. Wong's ability to testify to a reasonable degree of scientific certainty[.]" In other words, the State argues that although the circuit court "commented that Dr. Wong could not opine that Powell was under the influence of cocaine to a reasonable degree of scientific certainty, that finding was superfluous to its primary findings of lacking sufficient reliability and will cause confusion."

The State points to the following to support the circuit court's conclusion that Dr. Wong's opinion about the influence of both alcohol and cocaine would be speculative. First, the circuit court stated that Dr. Wong's initial letter stated that he was not able to opine whether Powell was under the influence of cocaine without additional information, and that although he had since received some additional information, he did not receive the specific information that he would need to make that determination. Second, Dr. Wong noted that he viewed the video of the shooting and stated, "I would not run up to him face-to-face if I see a gun in his hand." The State argued that "[w]hat Dr. Wong would do personally in that situation was not specialized knowledge requiring the testimony of an expert." Third, the State argues that Dr. Wong relied on a "McCance–Katz" article in opining in his September 7, 2010 letter that Powell was under the influence of cocaine, but admitted that he did not read this article. Finally, the State notes that Dr. Wong testified that there was no chart "correlating the range of cocaine with behavior[,]" and that "[w]ithout such a correlation, there was no foundation establishing a valid scientific technique by which Dr. Wong arrived at his conclusion" that Powell was under the influence of cocaine.

The State's argument lacks merit. First, the circuit court's ruling appears to rest

24. The Court of Appeals, however, held that the error in excluding expert testimony was harmless because given the evidence in the case, the exclusion of the expert testimony did not substantially influence the outcome of the trial. *Id.* at 528.

largely on Dr. Wong being unable to opine whether Powell was under the influence of cocaine to a reasonable degree of scientific certainty. As stated above, the circuit court stated the following in ruling on the admissibility of Dr. Wong's cocaine testimony:

> The Court, in reviewing Dr. Wong's initial letter, the subsequent September letter, as well as the testimony presented today, the Court thinks that it does not have sufficient reliability to present the issue before the jury and is going to cause confusion. The Court does note that in the [August] letter he indicated that he was not able to render an opinion with respect to whether [ ] Powell was under the influence of cocaine at the time of the shooting without additional information. He received some additional information between August and September, not the specific information that he indicated that he would need to do that, and he further indicated today that he could not make the—render an opinion to a reasonable degree of scientific certainty that [ ] Powell was under the influence of cocaine at the time of his-at the time of the shooting and therefore to allow him to opine about influence of both substances and the effect on the behavior of the deceased would be speculative. So Court precludes that use.
>
> . . . .
>
> [Dr. Wong] could not give an opinion in August and then he did render that opinion in the September 7th letter, but the Court is not allowing that opinion based on the testimony presented this morning. And he did indicate this morning that he cannot render that opinion to a reasonable degree of scientific certainty.

(Emphases added).

Second, the deficiencies argued by the State would not preclude the admission of Dr. Wong's testimony. At the HRE Rule 104 hearing, Dr. Wong stated to a "reasonable medical scientific probability" that the ingestion of cocaine in the proximity to Powell's death had an impact on his behavior. While Dr. Wong did not receive certain information such as the amount of cocaine ingested and the time of ingestion, such information was only required to render a more definitive opinion, i.e., to a reasonable degree of medical certainty. For example, Dr. Wong acknowledged that he never received information regarding the amount of cocaine ingested and the time of ingestion, which would be required to determine "more accurately" whether Powell was under the influence of cocaine. Dr. Wong also stated that he would need to know Powell's tolerance and time of ingestion "[t]o render with absolute certainty, medical certainty" whether he was under the influence of both alcohol and cocaine. With regard to the McCance–Katz article, it appears that although Dr. Wong cited to that article in the September 7, 2010 letter, he also cited and relied "primarily" on an "Eisenschmidt article," which quoted the McCance–Katz article.

In sum, the circuit court erred in precluding Dr. Wong's cocaine testimony. Although DeLeon did not argue on appeal that the circuit court erred in excluding Dr. Wong's cocaine testimony,[25] this court "may notice a plain error not presented." *See* Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4)(D). Specifically, "an appellate court 'may recognize plain error when the error committed affects substantial rights of the defendant.'" *Metcalfe*, 129 Hawai'i at 222, 297 P.3d at 1078 (quoting *Staley*, 91 Hawai'i at 282, 982 P.2d at 911). The appellate court "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *Nichols*, 111 Hawai'i at 334, 141 P.3d at 981 (quoting *Sawyer*, 88 Hawai'i at 330, 966 P.2d at 642).

This court has stated that "[t]he due process guarantee of the . . . Hawaii constitution [ ] serves to protect the right of an accused in a criminal case to a fundamentally fair trial." *State v. Kaulia*, 128 Hawai'i 479, 487, 291 P.3d 377, 385 (2013) (quoting *State v. Matafeo*, 71 Haw. 183, 185, 787 P.2d 671, 672

---

25. As discussed supra, DeLeon vigorously sought to admit Dr. Wong's cocaine testimony at trial, and argued before the circuit court that there was a sufficient basis for the admission of this evidence.

(1990)). "Central to the protections of due process is the right to be accorded a meaningful opportunity to present a complete defense." *Id.* (quoting *Matafeo*, 71 Haw. at 185, 787 P.2d at 672).

 To the extent that DeLeon was precluded from introducing Dr. Wong's testimony with regard to the probable effects of cocaine on Powell at the time of the shooting, DeLeon was not able to present a complete defense. DeLeon's self-defense argument relied largely on Powell's actions immediately before the shooting. Although Dr. Wong was able to present testimony at trial as to Powell's "high degree of alcohol intoxication," the jury was precluded from receiving information regarding Powell's cocaine use and the combined effects of cocaine and alcohol. Indeed, during the HRE Rule 104 hearing, Dr. Wong testified that the combined effects of cocaine and alcohol "generally are additive, especially in the effects of [sic] judgment." Dr. Wong also stated during the Rule 104 hearing that "the amount of cocaine or the presence of cocaine could render that level of intoxication perhaps a stage higher." The jury was precluded from hearing and considering such evidence. Because De-

Leon's defense depended heavily on Powell's behavior immediately before DeLeon shot him, there is a reasonable possibility that the exclusion of this testimony affected the outcome of the trial. In sum, the exclusion of Dr. Wong's cocaine testimony compromised DeLeon's ability to present a complete defense.

Accordingly, the circuit court plainly erred in precluding Dr. Wong's cocaine testimony. Therefore, we vacate DeLeon's convictions for second-degree murder (Count II) and Carrying or Use of a Firearm While Engaged in the Commission of a Separate Felony (Count IV).

### B. The jury instruction on self-defense was not erroneous

 DeLeon argues that the ICA gravely erred in concluding that the circuit court's self-defense instruction was not prejudicially insufficient, erroneous, inconsistent, or misleading. Specifically, DeLeon argues that the instruction was erroneous because it did not include the language of HRS § 703–304(3)[26] advising that "a person employing

---

**26.** HRS § 703–304 (1993 & Supp.2009) provides, in relevant part:

(1) Subject to the provisions of this section and of section 703–308, the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.

(2) The use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape, or forcible sodomy.

(3) Except as otherwise provided in subsections (4) and (5) of this section, a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used without retreating, surrendering possession, doing any other act which he has no legal duty to do, or abstaining from any lawful action.

(4) The use of force is not justifiable under this section:

(a) To resist an arrest which the actor knows is being made by a law enforcement officer, although the arrest is unlawful; or

(b) To resist force used by the occupier or possessor of property or by another person on his behalf, where the actor knows that the

person using the force is doing so under a claim of right to protect the property . . .

. . . .

(5) The use of deadly force is not justifiable under this section if:

(a) The actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take, except that:

(i) The actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be; and

(ii) A public officer justified in using force in the performance of his duties, or a person justified in using force in his assistance or a person justified in using force in making an arrest or preventing an escape, is not obliged to desist from efforts to perform his duty, effect the arrest, or prevent the escape because of resistance or threatened resistance by or on behalf of the person against whom the action is directed.

protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used without retreating, surrendering possession, doing any other act which he has no legal duty to do, or abstaining from any lawful action[.]" Because DeLeon did not object to the jury instruction at trial, he must first demonstrate instructional error by rebutting the "presumption that unobjected-to jury instructions are correct." *Nichols*, 111 Hawai'i at 337 n. 6, 141 P.3d at 984 n. 6. As set forth below, DeLeon fails to do so.

DeLeon's claim lacks merit because the circuit court's jury instruction on self-defense was not erroneous. First, the jury instruction that the circuit court provided was based on then—current HAWJIC 7.01,[27] which this court has upheld as "fully consonant with the controlling statutory and case law of this state." *State v. Augustin*, 101 Hawai'i 127, 127, 63 P.3d 1097, 1097 (2002).

Moreover, the *Augustin* court noted that the relevant jury instruction language in that case—which is virtually identical to the instant case—incorporated a key portion of HRS § 703–304(3). *Id.* at 127–28, 63 P.3d at 1097–98. Specifically, the *Augustin* court noted that the jury instruction stated in part as follows:

> The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware <u>or</u> as the defendant reasonably believed them to be.

*Id.* at 128, 63 P.3d at 1098 (emphasis in original).

■ The *Augustin* court stated that the foregoing language derived from the statuto-

(6) The justification afforded by this section extends to the use of confinement as protective force only if the actor takes all reasonable measures to terminate the confinement as soon as he knows that he safely can, unless the person confined has been arrested on a charge of crime.
(Emphases added).

**27.** This court amended HAWJIC 7.01 on April 4, 2011.

ry defenses of, inter alia, "use of force in self-protection," as codified in HRS § 703–304, including the language in subsection (3): "[A] person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be[.]" *Id.* at 128, 63 P.3d at 1098 (emphasis omitted). Put another way, the instruction conveys the legal basis for using protective force, despite not referencing HRS § 703–304(3) verbatim.[28] *See Metcalfe*, 129 Hawai'i at 230, 297 P.3d at 1086 ("The trial court is not required to instruct the jury in the exact words of the applicable statute but to present the jury with an understandable instruction that aids the jury in applying that law to the facts of the case.") (citing *Sawyer*, 88 Hawai'i at 330, 966 P.2d at 642). Accordingly, to the extent that DeLeon argues that the self-defense instruction was incomplete because it omitted the language in HRS § 703–304(3) that "a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be[,]" DeLeon's contention lacks merit.

■ Second, insofar as DeLeon argues that the self-defense instruction should have included the remaining language in HRS § 703–304(3) regarding retreating and other acts, his argument also fails. According to the commentary on subsection (3) and the explanatory note on the Model Penal Code provision upon which HRS § 703–304(3) is based, the subsection states the rule that an actor need not retreat or take other evasive action before estimating the necessity for the self-protective force. *See* Model Penal Code § 3.04 cmt. (2001); HRS § 703–304 cmt. (1993). Here, the given instruction guided the jury in determining whether the use of protective force was immediately necessary. After all, it would be apparent to the jury that an actor who may be justified in using

**28.** In the ICA, the State argued that HRS § 703–304(3) is inapplicable in cases involving deadly force because it refers to "protective force" and imposes no duty to retreat. However, HRS § 703–304(5) states that the use of deadly force is not justifiable if "[t]he actor knows that he can avoid the necessity of using such force with complete safety by retreating." Where such retreat is not possible, HRS § 703–304(3) applies.

immediate self-protective force would also be justified in not retreating, surrendering possession, or doing any other act which the actor has no legal duty to do. Moreover, the given instruction informed the jury that deadly force is not justifiable if the defendant "provoked the use of force against himself in the same encounter" or "knows that he can avoid the necessity of using such force with complete safety by retreating." Based on this instruction, it would be apparent to the jury that a defendant does not have to retreat if he or she knows that retreat cannot be done with complete safety. Accordingly, the instruction is sufficient given that it communicates these points despite not including the exact language of subsection (3).

Third, to the extent that DeLeon relies on this court's April 4, 2011 amendments to HAWJIC 7.01, such reliance is misplaced. In his application, DeLeon argues that "the self-defense instructions given were NOT correct for the very reason that they were amended: to apprise the jury that a defendant was permitted to estimate the necessity for the use of force ... under the circumstances as he reasonably believed them to be without retreating or doing any act which he has no legal duty to do." Insofar as DeLeon is arguing that the court's jury instructions are erroneous because they were revised,[29] this argument lacks merit given that the language of the jury instruction has been upheld as "fully consonant with the controlling statutory and case law of this state." [30] *Augustin,* 101 Hawai'i at 127, 63 P.3d at 1097. In any event, as stated, the given jury instructions sufficiently communicated the applicable law.

In sum, the self-defense jury instruction given in the instant case was not erroneous.

**29.** The amended HAWJIC 7.01A instruction with regard to " 'Deadly Force' Used" provides, in relevant part:

> The use of deadly force upon or toward another person is justified if the defendant reasonably believes that deadly force is immediately necessary to protect himself/herself on the present occasion against [death] [serious bodily injury].... The reasonableness of the defendant's belief that the use of protective deadly force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be when the deadly force was used.
>
> [The use of deadly force is not justifiable if the defendant, with the intent of causing death or serious bodily injury, provoked the use of force against himself/herself in the same encounter].
>
> [The use of deadly force is not justifiable if the defendant knows that he/she can avoid the necessity of using such force with complete safety by retreating, but the defendant is not required to retreat from his/her own dwelling unless he/she was the initial aggressor....]

The " 'Deadly Force' Not Used" section of the amended HAWJIC 7.01 provides, in relevant part:

> The use of force upon or toward another person is justified if the defendant reasonably believes that force is immediately necessary to protect himself/herself on the present occasion against the use of unlawful force by the other person. The reasonableness of the defendant's belief that the use of protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances

of which the defendant was aware or as the defendant reasonably believed them to be. The defendant may estimate the necessity for the use of force under the circumstances as he/she reasonably believes them to be when the force is used, without [retreating] [surrendering possession] [doing any other act that he/she has no legal duty to do] [abstaining from any lawful action].

(Emphasis added).

**30.** While DeLeon has argued that "[p]romulgation of the newly-drafted HAWJIC self-defense instructions, together with the repeal of HAWJIC 7.01, support [his] position" that the circuit court's instructions were erroneous, DeLeon also asserted that the amended deadly force HAWJIC instruction is erroneous because it still omits the HRS § 703–304(3) language. However, the amendment does not appear to reflect a change in the substantive law regarding self-defense, but instead appears to provide the jury with more specific instructions, depending on whether "force" or "deadly force" is at issue. *Metcalfe,* 129 Hawai'i at 231 n. 19, 297 P.3d at 1087 n. 19. In any event, for the reasons stated above, neither the previous nor current HAWJIC language regarding self-defense when deadly force is used is erroneous. Nevertheless, we agree with the dissent that, on remand, the circuit court may include in its self-defense instruction the language of HAWJIC 7.01B stating that a defendant may estimate the necessity of using force. *See* dissenting opinion at 13–14. Moreover, for the purposes of clarity and completeness, we suggest that the Standing Committee on Pattern Criminal Jury Instructions consider whether it would be appropriate to include the language in both 7.01A and 7.01B.

## IV. Conclusion

For the reasons set forth in this opinion, we vacate in part and affirm in part the ICA's judgment, and vacate the circuit court's judgment of conviction and sentence on Counts II and IV, and remand the case to the circuit court for further proceedings consistent with this opinion.

Concurring and Dissenting Opinion by ACOBA, J., in which POLLACK, J., Joins.

In my view, instructions on the defense of self-defense, raised by Petitioner/Defendant–Appellant Phillip DeLeon (DeLeon) were incomplete and therefore should be modified on remand to the Circuit Court of the First Circuit (the court). First, consistent with Hawai'i Revised Statutes (HRS) § 703–304(3) (Supp.2012) and the current Hawai'i Model Jury instruction should inform the jury that DeLeon was permitted to estimate the necessity of using deadly force if he could not retreat safely.

Second, the instruction must "communicate the jury's duty to view the circumstances" surrounding DeLeon's alleged use of deadly force in self defense from DeLeon's "subjective understanding of the situation." *State v. Augustin*, 101 Hawai'i 127, 136, 63 P.3d 1097, 1106 (2002) (Acoba, J., dissenting, joined by Ramil, J.). Such an instruction would state that "[t]he reasonableness of the [d]efendant's belief shall be determined from the point of view of a reasonable person in the [d]efendant's position under the circumstances as he believed them to be." *State v. Estrada*, 69 Haw. 204, 224–25, 738 P.2d 812, 826 (1987). I therefore respectfully concur [1] and dissent.

1. I agree that the judgment of conviction and sentence of the court must be vacated because DeLeon should have been allowed to introduce expert testimony demonstrating the presence of cocaine in the blood of Shaun Powell at the time of the shooting.

2. " 'Justification' is a '[j]ust, lawful excuse or reason for act or failing to act.' " *Augustin*, 101 Hawai'i at 131, 63 P.3d at 1101 (Acoba, J., dissenting) (quoting *Black's Law Dictionary* 865 (6th ed. 1990)).

## I.

Chapter 703 of the Hawai'i Penal Code "provides for a defense based on the legal concept of justification." [2] Supplemental Commentary to HRS § 703–300 (1993). "In most cases, the critical factor in determining whether an actor's conduct is justified is the actor's state of mind or belief respecting facts and circumstances." *Id.* The Hawai'i "rules on [the] justification of the use of force in self-protection," *see* Commentary to HRS § 703–304, are set forth in HRS § 703–304, "Use of force in self-protection," which provides in relevant part as follows:

(1) Subject to the provisions of this section ... the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.[3]

(2) The use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape, or forcible sodomy.

(3) Except as otherwise provided in subsections (4) and (5) of this section, a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used without retreating, surrendering possession, doing any other act which he has no legal duty to do, or abstaining from any lawful action.

(4) The use of force is not justifiable under this section:

(a) To resist an arrest which the actor knows is being made by a law enforcement officer, although the arrest is unlawful; or

3. In other words, subsection (1) " 'requires a belief by the actor that the use of protective force is actually necessary, and that unlawful force is to be used by the assailant' 'on the present occasion.' " *State v. Nupeiset*, 90 Hawai'i 175, 181, 977 P.2d 183, 189 (App.1999) (quoting Commentary to HRS § 703–304) (internal punctuation removed).

(b) To resist force used by the occupier or possessor of property or by another person on his behalf, where the actor knows that the person using the force is doing so under a claim of right to protect the property, except that this limitation shall not apply if:

(i) The actor is a public officer acting in the performance of his duties or a person lawfully assisting him therein or a person making or assisting in a lawful arrest; or

(ii) The actor believes that such force is necessary to protect himself against death or serious bodily injury.

(5) The use of deadly force is not justifiable under this section if:

(a) The actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating[4] or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take, except that:

(i) The actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be; and

(ii) A public officer justified in using force in the performance of his duties, or a person justified in using force in his assistance or a person justified in using force in making an arrest or preventing an escape, is not obliged to desist from efforts to perform his duty, effect the arrest, or prevent the escape because of resistance or threatened resistance by or on behalf of the person against whom the action is directed.

. . . .

(Emphases added.)

The definition section to chapter 703, HRS § 703–300, defines "believes" as "reasonably believes," "unless a different meaning is plainly required." The Supplemental Commentary to HRS § 703–300 explains that this definition "adopts the 'reasonable [person] standard with respect to justification for the use of force in self protection[.]'" (Quoting Conf. Com Rep. No. 2, in 1972 House Journal, at 1042.) This standard was adopted because it was the "'Committee's finding that the requirement that a person's belief be 'reasonable' . . . will prove an objective basis by which to gauge whether or not the use of force was justified.'" Supplemental Commentary to HRS § 703–300 (quoting Conf. Com. Rep. No. 2, in 1972 House Journal, at 1042). However, "[i]n providing for the application of an objective gauge as to the defendant's actions, the legislature did not preclude the fact-finder's consideration of . . . the defendant's subjective circumstances." *Augustin,* 101 Hawai'i at 132, 63 P.3d at 1102 (Acoba, J., dissenting).

## II.

At trial, the court's instruction on self-defense provided in relevant part as follows:

Justifiable use of force—commonly known as self-defense—is a defense to the charge of Attempted Murder in the First Degree in Count 1 and Murder in the Second Degree in Count 2 and the included offense in Count 2 of Manslaughter. The burden is on the prosecution to prove beyond a reasonable doubt that the force used by the defendant was not justifiable. If the prosecution does not meet its burden, then you must find the defendant not guilty.

The use of force upon or toward another person is justified when a person reasonably believes that such force is immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person. The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circum-

---

**4.** Therefore, a defendant is "legally prohibited from 'the use of deadly force when [he or she] can avoid it with complete safety by retreating.'"

*Nupeiset,* 90 Hawai'i at 184, 977 P.2d at 192 (quoting Commentary to HRS § 703–304) (internal punctuation removed).

stances of which the defendant was aware or as the defendant reasonably believed them to be.

The use of deadly force upon or toward another person is justified when a person using such force reasonably believes that deadly force is immediately necessary to protect himself on the present occasion against death or serious bodily injury. The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.

The use of deadly force is not justifiable if the defendant, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter, or if the defendant knows that he can avoid the necessity of using such force with complete safety by retreating.

"Force" means any bodily impact, restraint, or confinement, or the threat thereof.

"Unlawful force" means force which is used without the consent of the person against whom it is directed and the use of which would constitute an unjustifiable use of force or deadly force.

"Deadly force" means force which the actor uses with the intent of causing, or which he/she knows to create a substantial risk of causing, death or serious bodily injury. Intentionally firing a firearm in the direction of another person or in the direction which the person is believed to be constitutes deadly force.

A threat to cause death or serious bodily injury, by the production of a weapon or otherwise, so long as the actor's intent is limited to creating an apprehension that he will use deadly force if necessary, does not constitute deadly force.

"Bodily injury" means physical pain, illness, or any impairment of physical condition.

"Serious bodily injury" means bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

If and only if you find that the defendant was reckless in having a belief that he was justified in using self-protective force against another person, or that the defendant was reckless in acquiring or failing to acquire any knowledge or belief which was material to the justifiability of his use of force against the other person, then the use of such self-protective force is unavailable as a defense to the offense of Manslaughter.

(Emphases added.) This instruction was based on the then-current Hawai'i Model Jury Instruction on Self–Defense, HAWJIC 7.01 (2005), which stated in relevant part as follows:

Justifiable use of force—commonly known as self-defense—is a defense to the charge of (specify charge and its included offenses except those involving a reckless state of mind). The burden is on the prosecution to prove beyond a reasonable doubt that the force used by the defendant was not justifiable. If the prosecution does not meet its burden then you must find defendant not guilty.

. . . .

[The use of deadly force upon or toward another person is justified when a person using such force reasonably believes that deadly force is immediately necessary to protect himself/herself on the present occasion against [death] [serious bodily injury] [kidnapping] [rape] [forcible sodomy]. The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.]

[The use of deadly force is not justifiable if the defendant, with the intent of causing death or serious bodily injury, provoked the use of force against himself/herself in the same encounter, or if the defendant

knows that he/she can avoid the necessity of using such force with complete safety by retreating.] [5]

Following DeLeon's trial, however, the Model Jury instructions on self-defense were updated and divided into two separate instructions, HAWJIC 7.01A (2011) and HAWJIC 7.01B (2011). HAWJIC 7.01B, "Self–Defense When Only Force Is At Issue," was revised to explain that a defendant may "estimate the necessity for the use of force":

> The use of force upon or toward another person is justified if the defendant reasonably believes that force is immediately necessary to protect himself/herself on the present occasion against the use of unlawful force by the other person. The reasonableness of the defendant's belief that the use of protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be. <u>The defendant may estimate the necessity for the use of force under the circumstances as he/she reasonably believes them to be when the force is used, without [retreating] [surrendering possession] [doing any other act that he/she has no legal duty to do] [abstaining from any lawful action].</u>

(Emphasis added.) However, HAWJIC 7.01A, "Self–Defense When The Use of 'Deadly Force' Is At Issue," did not include the same language underscored above:

> The use of deadly force upon or toward another person is justified if the defendant reasonably believes that deadly force is immediately necessary to protect himself/herself on the present occasion against [death] [serious bodily injury] [kidnapping] [rape] [forcible sodomy]. The reasonableness of the defendant's belief that the use of protective deadly force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed

them to be when the deadly force was used.

The language added to HAWJIC 7.01B regarding the defendant's ability to estimate the necessity of using force was drawn from HRS § 703–304(3), which, to reiterate, provides that "except as otherwise provided in subsections (4) and (5) of this section, a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used without retreating, surrendering possession, doing any other act which he has no legal duty to do, or abstaining from any lawful action."

### III.

In his Application, DeLeon argues that the jury instruction on the use of deadly force was incomplete because it did not include the language from the new HAWJIC 7.01B stating "that a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used." (Internal brackets omitted.) According to DeLeon, such an instruction would "apprise the jury that a defendant [is] permitted to estimate the necessity for the use of [deadly force] ... under the circumstances as he reasonably believed them to be without retreating or doing any act which he has no legal duty to do."

In its Answering Brief before the ICA, Respondent/Plaintiff–Appellee the State of Hawai'i (the State) responded that the jury instructions were not erroneous because "the plain language of HRS § 703–304 indicates that subsection (3) does not apply to actions involving deadly force." According to the State, "[s]ubsection (3) establishes no duty to retreat, surrender possessions, or do any other act that an actor has not legal duty to do, 'except as otherwise provided in subsections (4) and (5)[.]'" (Quoting HRS § 703–304(3).) "Subsection (5), on the other hand, establishes a duty to retreat where deadly force is employed." The State therefore contended that "if the actor uses deadly force, subsection (3) would not apply[.]" Hence, the State

---

5. The model jury instructions indicate that the bracketed language "may or may not apply depending on the facts" of a particular case. HAWJIC 7.01 (2005).

concluded that "the self-defense instruction to the jury was proper."

## IV.

The majority concludes that the jury instructions were not erroneous because they were "based on [the] then-current HAWJIC 7.01,[ ] which the court [ ] upheld as 'fully consonant with the controlling statutory and case law of this state.' " Majority opinion at 487, 319 P.3d at 406 (quoting *Augustin,* 101 Hawai'i at 127, 63 P.3d at 1097 (majority opinion)). First, as to DeLeon's contention that the jury instructions should have included language stating that "a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be," the majority concludes that the instruction was sufficient because it was "derived from" HRS § 703–304, and "conveys the legal basis for using protective force," even though it does not "referenc[e] HRS § 703–304(3) verbatim." *Id.* at 487, 319 P.3d at 406. Second, the majority concludes that "insofar as DeLeon argues that the self-defense instruction should have included the remaining language in HRS § 703–304(3) regarding retreating and other acts" [6] the jury instructions were sufficient to convey to the jury that "a defendant does not have to retreat if he or she knows that retreat can be done with complete safety." *Id.* at 488, 319 P.3d at 407.

## V.

Contrary to the position of the State, HRS § 703–304(3) is applicable in deadly force actions. To reiterate, HRS § 703–304(3) states in relevant part that "[e]xcept as otherwise provided in subsection[ ] . . . (5) of this section, a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used without retreating[.]" HRS § 703–304(5) states that "[t]he use of deadly force is not justifiable under this section if," *inter alia,* "[t]he actor knows

that he can avoid the necessity of using such force with complete safety by retreating."

Read together, HRS § 703–304(3) is not incompatible with HRS § 703–304(5). When the reference to HRS § 703–304(5) in HRS § 703–304(3) is replaced with the actual language of HRS § 703–304(5), HRS § 703–304(3) provides that "except [when the actor knows that he can avoid the necessity of using deadly force with complete safety by retreating], a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used without retreating." In other words, the plain language of HRS § 703–304(3) states that, even in deadly force actions, a defendant may estimate the necessity of using force <u>unless</u> he or she can avoid the necessity of using deadly force by retreating.

This reading of HRS § 703–304(3) is consonant with the commentary to HRS § 703–304 and the comment to Model Penal Code (MPC) § 3.04. The commentary to HRS § 703–304 states that "subsection (3) states the <u>generally applicable rule</u> that the actor need not retreat or take any other evasive action <u>before estimating the necessity for the use of force</u> in self-protection." (Emphases added.) Similarly, the comment to MPC § 3.04 states that "[s]ubsection 2(c) [the MPC equivalent of HRS § 703–304(3) ] <u>states the converse</u> of the rules articulated in subsections 2(a) [the MPC equivalent of HRS § 703–304(4) ] and 2(b) [the MPC equivalent of HRS § 703–304(5) ]." *Model Penal Code and Commentaries, Part I,* at 60 (Emphasis added). In other words, HRS § 703–304(3) "<u>provide[s] the general principles</u> that govern the use of force in self protection," and HRS § 703–304(5) "provide[s] the exceptions." *Id.* at 61 (emphasis added).

Thus, as explained by the MPC comment, HRS § 703–304(3) sets forth the "general rule" that "except when [HRS § 703–304(4) or (5) ] otherwise require, the actor need not retreat . . . and he [or she] may employ

---

**6.** It does not appear that DeLeon actually argues that such language should have been included in the jury instructions. To reiterate, in his Application, DeLeon states that "the language [he] claimed should have been included" was " 'that

a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used[.]' "

protective force according to his [or her] estimation of the necessity under the circumstances as he believes them to be when force is used." *Id.* at 60–61. Hence, this "general rule" applies to actions involving <u>both</u> deadly force and non-deadly force, provided that the applicable statutory exceptions, such as the duty to retreat prior to using deadly force, do not apply. Because HRS § 703–304(3) sets forth a general rule governing the use of deadly force subject only to the exceptions in HRS § 703–304(5), the State incorrectly concludes that HRS § 703–304(3) is never applicable in deadly force actions. Nevertheless, neither the jury instruction used in this case nor the present model jury instruction on the use of deadly force in self defense, HAWJIC 7.01A, includes the language of HRS § 703–304(3).

### VI.

To reiterate, in 2011 the model jury instruction on the use of non-deadly force in self-defense, HAWJIC 7.01B, was updated to reflect the language of HRS § 703–304(3). That instruction now provides that "[t]he defendant may estimate the necessity for the use of force under the circumstances as he/she reasonably believes them to be when the force is used, without [retreating] [surrendering possession] [doing any other act that he/she has no legal duty to do] [abstaining from any lawful action]." However, similar language was omitted from the model jury instruction on the use of deadly force in self-defense, HAWJIC 7.01A.

By more closely reflecting the language of the governing statute, the updated model jury instruction on the use of non-deadly force in self-defense in HAWJIC 7.01B allows the jury to be better informed when making a determination as to whether the use of force in self-defense was justified. The additional language is a more complete statement of the governing law and provides more clarity in explaining to a jury both that, under Hawai'i law, a defendant may estimate the necessity of using force in self-protection, and that an actor is not required to abstain from lawful action before using force in self defense.

There is no reason for these benefits to be confined to cases involving the use of non-deadly force. As explained *supra*, the language in HRS § 703–304(3) applies to actions involving both deadly force and non-deadly force. Inasmuch as the updated language of HAWJIC 7.01B is evidently a more accurate and complete statement of the law, it is incongruous that similar language is not also included in HAWJIC 7.01A, thereby depriving the fact-finder of the more comprehensive statement of the law in cases involving the use of deadly force. Because the new model jury instructions may be utilized after the case is remanded, I would instruct the court to include the language from HAWJIC 7.01B stating that a defendant may estimate the necessity of using force in its self-defense instruction on remand.

### VII.

I would also hold that the court's self-defense instruction was incomplete because it did not adequately reflect the jury's duty to consider DeLeon's subjective view of the circumstances surrounding the use of deadly force, in addition to the jury's duty to ensure that the use of force was objectively reasonable. *Augustin,* 101 Hawai'i at 132, 63 P.3d at 1102 (Acoba, J., dissenting). A self-defense instruction is incomplete if it does not "instruct [the jury] to consider the situation from [the defendant's] position." *State v. Pond,* 118 Hawai'i 452, 492, 193 P.3d 368, 408 (2008) (Acoba, J., concurring and dissenting). This proposition was also approved by Justice Duffy's concurring and dissenting opinion in *Pond,* 118 Hawai'i at 492, 193 P.3d at 408 (Duffy, J., concurring and dissenting) ("In my view, the jury instruction was improper ... for the reasons stated by Justice Acoba in his Concurring and Dissenting Opinion, whose analysis I agree with on this point.").

### A.

Under Hawai'i law, determining whether the use of force in self-defense was justified requires "a combined subjective and objective test." *Augustin,* 101 Hawai'i at 132, 63 P.3d at 1102 (Acoba, J., dissenting). The subjective prong of the analysis requires the

finder of fact to "consider the circumstances surrounding the use of force as the defendant subjectively viewed them." *Id.; see also State v. Kupihea,* 80 Hawai'i 307, 316, 909 P.2d 1122, 1131 (1996); *State v. Pemberton,* 71 Haw. 466, 477, 796 P.2d 80, 85 (1990); *State v. Faafiti,* 54 Haw. 637, 645, 513 P.2d 697, 703 (1973); *Nupeiset,* 90 Hawai'i at 186, 977 P.2d at 194; *State v. Straub,* 9 Haw.App. 435, 445, 843 P.2d 1389, 1394 (1993). In other words, "the focus is on the circumstances known to the defendant, thus directing the jury to consider the actions of a 'reasonable person <u>in the defendant's position</u> under the circumstances as he [or she] believed them to be.'" *Pond,* 118 Hawai'i at 491, 193 P.3d at 407 (Acoba, J., concurring and dissenting) (emphasis in original) (quoting *Estrada,* 69 Haw. at 224–25, 738 P.2d at 826 (1987)).

"The objective prong of the analysis requires jurors to determine whether a reasonable person, considering the circumstances as [the defendant] subjectively did, would deem the use of force necessary." *Augustin,* 101 Hawai'i at 132, 63 P.3d at 1102 (Acoba, J., dissenting); *see also Kupihea,* 80 Hawai'i at 316, 909 P.2d at 1131; *Pemberton,* 71 Haw. at 477, 796 P.2d at 85; *Faafiti,* 54 Haw. at 645, 513 P.2d at 703; *Nupeiset,* 90 Hawai'i at 186, 977 P.2d at 194; *State v. Pavao,* 81 Hawai'i 142, 145, 913 P.2d 553, 556 (App. 1996); *State v. Lubong,* 77 Hawai'i 429, 433, 886 P.2d 766, 770 (App.1994); *Straub,* 9 Haw. App. at 444, 843 P.2d at 1394. Thus, "emphasis is placed on the reasonable person standard so the defendant's use of force must be 'determined from the point of view of a reasonable person.'" *Pond,* 118 Hawai'i at 491, 193 P.3d at 407 (Acoba, J., concurring and dissenting) (quoting *Estrada,* 69 Haw. at 225, 738 P.2d at 826).

### B.

The combined subjective and objective test serves to remedy the injustice that would be caused by either a wholly subjective or wholly objective test. *Augustin,* 101 Hawai'i at 133, 63 P.3d at 1103 (Acoba, J., dissenting). "[A] wholly subjective test would result in lawlessness because self-defense would be premised only on the actor's 'internal beliefs,'

the effect of which would be to sanction unreasonable conduct[.]" *Id.* In other words, "'self-defense would always justify homicide so long as the defendant was true to his or her own internal beliefs.'" *Id.* (quoting *State v. Janes,* 121 Wash.2d 220, 850 P.2d 495, 505 (1993)) (emphasis omitted). An objective aspect to the test prevents such a result by "establish[ing] a standard against which the defendant's belief can be measured[.]" *Augustin,* 101 Hawai'i at 133, 63 P.3d at 1103 (Acoba, J., dissenting).

On the other hand, under a wholly objective test, the jury may not consider "factors such as [the defendant's] interaction with [the complainant or decedent] and the facts known to [the defendant]." *Pond,* 118 Hawai'i at 492, 193 P.3d at 408 (Acoba, J., concurring and dissenting). Thus, an objective test "might strip an actor who mistakenly believes that force is necessary in his or her defense of any defensive claim, thus permitting conviction of an [intentional] offense, even murder." *Augustin,* 101 Hawai'i at 133, 63 P.3d at 1103 (Acoba, J., dissenting) (internal brackets, citations, and quotation marks omitted). In other words, "a strictly objective standard results in culpability where the mens rea requirement of intent may not have been met." *Id.* Thus, the subjective aspect to the self-defense test avoids this possibility by compelling the jurors to consider the circumstances as the defendant believed them to be.

### VIII.

The jury instructions in the instant case stated in relevant part that "[t]he reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined <u>from the viewpoint of a reasonable person in the defendant's position</u> under the circumstances of which the defendant <u>was aware or as the defendant reasonably believed them to be.</u>" (Emphases added.) The instructions thus indicated to the jury that "[DeLeon's] actual understanding of the circumstances must be subjected to a reasonable person standard." *Augustin,* 101 Hawai'i at 136, 63 P.3d at 1106 (Acoba,

J., dissenting).[7] This is a wholly objective test that precludes the jury's consideration of the circumstances as the defendant, in this case DeLeon, subjectively believed them to be. The jury's consideration of subjective belief is plainly required.[8] Additionally, the phrase "was aware" was insufficient to convey to the jurors the necessity of evaluating the use of force in self defense from DeLeon's subjective viewpoint. *Augustin,* 101 Hawai'i at 136, 63 P.3d at 1106 (Acoba, J., dissenting).

### A.

In contrast to the instructions used in this case, the jury instructions approved by this court in *Estrada* explains to the jury both their duty to consider the defendant's subjective viewpoint and the necessity of evaluating that viewpoint from the perspective of a reasonable person:

A person is justified in using force upon or toward another when the person using the force reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.

. . . .

The reasonableness of the [d]efendant's belief shall be determined from the point of view of a reasonable person in the [d]efendant's position under the circumstances as he believed them to be.

*Estrada,* 69 Haw. at 224–25, 738 P.2d at 826 (emphases added); *see also Pond,* 118 Hawai'i at 489, 492, 193 P.3d at 405, 408 (Acoba, J., concurring and dissenting) (citing the instruction used in Estrada with approval); *Pond,* 118 Hawai'i at 492, 193 P.3d at 408 (Duffy, J., agreeing with the analysis in Justice Acoba's concurring and dissenting opinion). This language conveys to the jury all necessary aspects of the self-defense test.

First, the phrase "in the defendant's position under the circumstances as he believed them to be" illustrates the necessity of evaluating the defendant's subjective belief that the circumstances require the use of force in self defense. *See Augustin,* 101 Hawai'i at 135, 63 P.3d at 1105. Second, the requirement that the defendant's belief be evaluated from the point of view of a reasonable person in the defendant's position explains that the jury must consider "whether the defendant's view of the circumstances" was reasonable. Third, the requirement that the defendant's use of force was "immediately necessary for the purpose of protecting himself" conveys to the jury that it must determine whether "a reasonable person" under those circumstances would believe the force used was necessary.

Based on the foregoing, on remand I would require the court to replace the language in

---

7. The self-defense instruction at issue in *Augustin* also stated that "[t]he reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be." *Augustin,* 101 Hawai'i at 130, 63 P.3d at 1100 (Acoba, J., dissenting).

8. It is well-established that Hawai'i's self-defense test requires a defendant to demonstrate that he or she subjectively believed the use of self-defense was necessary. In *Faafiti,* this court approved jury instructions that stated that "[u]nder the law of self-defense, it is lawful for a person who is being assaulted to defend himself from attack if, as a reasonable person, he has grounds for believing and does believe that bodily injury is about to be inflicted upon him." *Id.* at 645, 513 P.2d at 703 (emphasis added); *see also Lubong,* 77 Hawai'i at 433, 886 P.2d at 770 (stating

that the first prong of the self-defense test "requires a determination of whether the defendant had the requisite belief that deadly force was necessary" (emphasis added)). In other words "[t]he fact-finder is required to place itself in the shoes of the defendant." *Lubong,* 77 Hawai'i at 433, 886 P.2d at 770; *see also Pemberton,* 71 Haw. at 477, 796 P.2d at 85 (holding that, in a self-defense case, the jury "must consider the circumstances as the [d]efendant subjectively believed them to be at the time he tried to defend himself" (emphasis added)).

This requirement of "[e]valuating the evidence from a subjective point of view ensures that the fact-finder fully understands the totality of the defendant's actions from the defendant's own perspective." *Lubong,* 77 Hawai'i at 433, 886 P.2d at 770 (internal quotation marks removed). Hence, including a subjective element in the self-defense test insures that the outcome is fair to a defendant by requiring the jury to initially view the facts from the defendant's perspective. *See* discussion *supra.*

the jury instruction stating that "[t]he reasonableness of the defendant's belief [would be] ... determined from the viewpoint of a reasonable person ... under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be," with the referenced language from the jury instruction in *Estrada*. The *Estrada* formulation properly reflects the jury's obligation to consider both the defendant's subjective point of view and the circumstances from an objective point of view in evaluating a defendant's use of force in self-defense.

### B.

Moreover, the term "aware" in the phrase "under the circumstances of which the defendant was aware" was manifestly a misstatement of the law. "Aware" is defined as "having or showing realization, perception, or knowledge." *Webster's Collegiate Dictionary* 81 (10th ed. 1993). However, "believe" means "to accept as true, genuine, or real." *Id.* at 104. Thus, "awareness of certain circumstances is not necessarily congruent with a belief in those circumstances." *Augustin,* 101 Hawai'i at 136, 63 P.3d at 1106 (Acoba, J., dissenting). The words "was aware," therefore, would not communicate to the jurors the necessity of evaluating whether DeLeon <u>believed</u> that the circumstances required the used of deadly force in self-defense. *Id.*

Moreover, to reiterate, the instruction stated that the necessity of the use of force shall be evaluated "under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be." (Emphasis added.) The use of the term "or" "permitted the jury to rest its decision on [that] part of the instruction" related to the DeLeon's subjective awareness of the circumstances surrounding his use of force in self-defense. *Augustin,* 101 Hawai'i at 136, 63 P.3d at 1106 (Acoba, J., dissenting). Hence, this part of the instruction also was not a correct statement of the law because it did not inform the jury that the defendant's subjective understanding, i.e. awareness (assuming its correct use), of the situation must be evaluated from a reasonable person's perspective. *Id.*

### IX.

For the foregoing reasons, I respectfully concur in part and dissent in part.