**NOT FOR PUBLICATION  IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000319
30-SEP-2020
08:13 AM

NO. CAAP-19-0000319

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


STATE OF HAWAIʻI, Plaintiff-Appellee,
v.
PETER DAVID, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 1PC-11-1-000050)


MEMORANDUM OPINION
(By:  Ginoza, Chief Judge, Chan and Hiraoka, JJ.)

### I.  Introduction

Defendant-Appellant Peter David (**David**) appeals from
the February 28, 2019 Judgment of Conviction and Sentence entered
by the Circuit Court of the First Circuit (**Circuit Court**).[1]  On
January 12, 2011, Plaintiff-Appellee State of Hawaiʻi (**State**)
charged David by Complaint with: murder in the second degree for
the death of his cousin, Santhony Albert (**Albert**) in violation of
Hawaii Revised Statutes (**HRS**) 707-701.5 and 706-656 (**Count I**);
and assault in the second degree as to Torokas Kikku (**Kikku**) in
violation of HRS 707-711(1)(d) (**Count II**).

On October 13, 2011, after a jury trial,[2] David was
found guilty of the included offenses of manslaughter and third-
degree assault.  Following a successful appeal, David's
conviction and sentence were vacated and the case was remanded

---

[1]  The Honorable Paul B.K. Wong presided.

[2]  The Honorable Randal K.O. Lee presided over the first jury trial.

for a new trial.  State v. David, 141 Hawaiʻi 315, 409 P.3d 719 (2017) (improper admission of defendant's bad character evidence exceeded the scope of rebuttal testimony and required a new trial).

After a second jury trial on the charges of manslaughter for Count I and assault in the third degree for Count II, David was found guilty in Count I of the lesser included offense of assault in the first degree in violation of HRS § 707-710 (1993),[3] and in Count II of assault in the third degree in violation of HRS § 707-712(1)(a) (1993).[4]  The Circuit Court sentenced David to an indeterminate term of imprisonment of ten years for Count I and thirty-days of jail for Count II, to run concurrently.

On appeal, David contends that the Circuit Court erred in (1) excluding blood-alcohol concentration evidence from the jury, and (2) denying David's motion for mistrial because of alleged prosecutorial misconduct.

For the reasons set forth below, we affirm.

## II. Discussion

### A.  Admissibility of Albert's Blood-Alcohol Concentration Level

On November 28, 2018, the Circuit Court heard the parties' motions in limine.  The State sought exclusion of the toxicology report for Albert and all references to the presence of alcohol in Albert's blood.  David objected to the State's in limine request and argued, *inter alia*, that the results of the toxicology report were relevant and necessary to corroborate his

---

[3]  HRS § 707-710 (1993) provides in relevant part:

**§707-710 Assault in the first degree**.  (1) A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person.

[4]  HRS § 707-712(1)(a) (1993) provides:

**§707-712 Assault in the third degree**.  (1) A person commits the offense of assault in the third degree if the person:
   (a)   Intentionally, knowingly, or recklessly causes bodily injury  to another person[.]

2

claim of self-defense that Albert was highly intoxicated and was the first aggressor.  The Circuit Court granted in part and denied in part the State's motion in limine, holding that the toxicology result establishing the presence of alcohol in Albert's blood was admissible, but Albert's blood-alcohol concentration <u>level</u> was not admissible.

On December 5, 2018, the Circuit Court revisited the issue following an oral motion to reconsider and ruled as follows:

> THE COURT: Again, after taking judicial notice of the records, files, and proceedings herein, the Court respectfully denies Defendant's request to reconsider its previous in limine ruling regarding the blood alcohol number.  The Defense is able to introduce and cross-examine witnesses regarding the presence of alcohol, not just at the scene and consumed by the decedent, but may cross-examine the medical examiner regarding the toxicology results, that there was the presence of alcohol in the decedent's blood.
>
> The actual number does provide the opportunity for the jury to speculate and perhaps even be confused because <u>without any expert testimony to explain the meaning of the number, it is, in this Court's opinion, speculative</u>.  As indicated by [the Deputy Prosecuting Attorney], alcohol affects people differently.  In addition to tolerance of individuals, their weight and their metabolic makeup also affect the ability to process alcohol in a person's system and therefore minimize or enhance the effect of any particular blood alcohol on that person.  <u>So without any anchoring testimony to explain the number, it is in fact speculative</u>.
>
> And with respect to common understanding as to the legal limit for driving, while .08 is the legal limit established by the legislature to delineate the line in the sand as to whether or not a person is operating a vehicle under the influence of an intoxicant, it really doesn't point out to the amount of impairment that person is actually experiencing. At one point in time, the legal limit not too long ago was .10, and for other states, it has been a different number, and <u>again, that number, without some anchoring testimony, is speculative and does not add anything to the jury's consideration of the case</u>.
>
> <u>So based on [Hawaii Rules of Evidence] Rule 403, your request is respectfully denied</u>.

(Emphasis added).

On appeal, David contends that the Circuit Court erred in excluding evidence of Albert's blood-alcohol concentration level of .252 from the jury because it was critical to his self-defense in asserting Albert was the aggressor and David was

justified in using deadly force.

Hawaii Rules of Evidence Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Whether relevant evidence is admissible under Rule 403 is a determination well-suited to a trial court's exercise of discretion because it requires a "cost-benefit calculus" and a "delicate balance between probative value and prejudicial effect."  Kaeo v. Davis, 68 Haw. 447, 454, 719 P.2d 387, 392 (1986) (internal quotation marks and citations omitted).  "[T]he traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a 'judgment call' on the part of the trial court."  State v. Cordeiro, 99 Hawaiʻi 390, 404, 56 P.3d 692, 706 (2002) (citation omitted).  "An abuse of discretion occurs when the court clearly exceeds the bounds of reason or disregards rules or principles of law to the substantial detriment of a party litigant."  State v. St. Clair, 101 Hawaiʻi 280, 286, 67 P.3d 779, 785 (2003) (quoting Cordeiro, 99 Hawaiʻi at 404, 56 P.3d at 706).

David cites to State v. Clark, 83 Hawaiʻi 289, 926 P.2d 194 (1996) and contends that an expert witness is no longer necessary to explain blood-alcohol concentration and its effects on a person because the effects of alcohol and an individual's blood-alcohol concentration have become common knowledge.  David also argues that State v. DeLeon, 131 Hawaiʻi 463, 319 P.3d 382 (2014) is not applicable in this case because Albert only ingested alcohol and there were no illicit drugs in his system. David also cites several out-of-state decisions to support his contention that it is reversible error to exclude evidence of a decedent's blood-alcohol concentration level where the defendant argues self-defense.

First, David misstates the holding in <u>Clark</u> and <u>Clark</u> is not dispositive in this case.  The issue in <u>Clark</u> was whether an expert in domestic violence, who was not familiar with the facts in the case and who had not interviewed either the victim or the defendant, could testify generally with respect to domestic violence and domestic violence victims, particularly that it is not uncommon for victims of domestic violence to recant allegations of abuse.  83 Hawai‘i at 298, 926 P.2d at 203.  The Hawai‘i Supreme Court rejected the defendant's argument that "absent a determination by an expert that [the alleged victim] was in fact suffering from symptoms associated with domestic violence," expert testimony regarding the recantation phenomenon in domestic violence cases was irrelevant.  <u>Id.</u> at 299, 926 P.2d at 204.  Rather, the supreme court in <u>Clark</u> held that "it was appropriately left to the jury to determine whether [the alleged victim's] behavior was consistent with the behavior described by [the expert]."  <u>Id.</u>  Here, the issue is not akin to the issue in <u>Clark</u>.  Rather, the Circuit Court pointed out that while it might be common knowledge that alcohol could affect behavior, that knowledge does not extend to how blood-alcohol concentration levels correspond to certain behaviors and impairment in an individual.  The Circuit Court thus reasoned that without expert or "anchoring" testimony, the meaning of the blood-alcohol concentration level or number would be speculative.

Second, David makes a distinction without a difference with regard to his reliance on the decision in <u>DeLeon</u>.  In <u>DeLeon</u>, the defendant was charged with, *inter alia*, Murder in the Second Degree and asserted self-defense in shooting the decedent.  The Hawai‘i Supreme Court held that the trial court plainly erred in excluding expert testimony on cocaine use, the decedent's "cocaine level" at the time of the shooting, and "the probable effects of cocaine on [the decedent] at the time of the shooting[.]"  <u>DeLeon</u>, 131 Hawai‘i at 465, 482, 486, 319 P.3d at 384, 401, 405.  Nothing in <u>DeLeon</u> supports David's contention that expert testimony is not necessary to explain the

significance of blood-alcohol concentration levels on an individual.  To the contrary, in DeLeon, expert testimony had been admitted to explain, *inter alia*, how the ranges in blood-alcohol concentration levels correlated to certain symptoms, behaviors, and impairment.  Id. at 474-75, 319 P.3d at 393-94.

Finally, we conclude that the out-of-state cases David cites are distinguishable.  In Cromartie v. State, 1 So.3d 340, 342 (Fla.Dist.Ct.App. 2009), the defendant was convicted of manslaughter and, on appeal, the District Court of Appeal of Florida held the trial court had reversibly erred in excluding evidence of the victim's blood-alcohol level.  However, in Cromartie, the court noted that the excluded evidence was critical to the defendant's self-defense theory because the defendant's testimony and statement to police about the decedent's aggressive behavior were not corroborated by other witnesses.  Id. at 343.  Further, it appears there was no other evidence as to the decedent's consumption of alcohol on the day of the incident.

In Durrett v. Commonwealth, 2015 WL 4979723 (Ky. 2015), the defendant was charged with murder for shooting the decedent and claimed self-defense.  The trial court allowed the medical examiner to testify that the decedent had consumed alcohol on the day he died, but precluded testimony about toxicology results showing the decedent had a .12% blood-alcohol content level.  The defendant was convicted and on appeal asserted that the trial court had abused its discretion in excluding the decedent's blood-alcohol concentration level.  The defendant argued that:

> not allowing this evidence prevented him from presenting a complete and meaningful defense because it precluded him from providing to the jury a means of assessing [the decedent's] level of intoxication at the time of the shooting, which would have provided additional insight into [the decedent's] behavior and [defendant's] alleged belief that [the decedent] posed an imminent threat when he shot him.

Id. at *3.  The Kentucky Supreme Court held that the decedent's blood-alcohol concentration level "was relevant and could have been admitted at trial[,]" but also noted that "trial courts

6

wield substantial discretion in admitting or excluding evidence at trial[.]"  Id. at *5.  Ultimately, the Kentucky Supreme Court held that the exclusion of the decedent's .12% blood-alcohol concentration level was not an abuse of discretion where, among various other factors, evidence was admitted that the decedent had been drinking alcohol which allowed for many of the same inferences as the toxicology evidence.  Id.

Thus, Cromartie and Durrett do not support David's contention that the Circuit Court abused its discretion in precluding Albert's blood-alcohol concentration level in this case.  Here, multiple witnesses testified that Albert had been drinking alcohol from the previous day, January 1, 2011, and continued drinking late into the night.  For instance, Arlynn Ewen (**Ewen**) testified that Albert arrived at about 8:00 p.m. at a party near Gulick Avenue, that all the men were drinking and Albert was drinking beer.  Ewen further testified that around 9:00 p.m., she and others including Albert left the party and went to another apartment, where the men, including Albert, continued to drink beer.  Ewen testified that after Chino Moses (**Moses**) went to bed and Erick Sam had passed out in the hallway, Albert and David continued drinking alcohol and appeared drunk.  It was on the ground floor near this second apartment where the incident between David and Albert occurred.  Kikku also testified that she was at the first party on January 1, 2011, that when she arrived after finishing work at 3:00 p.m. Albert was already there, and that she saw, among others, David and Albert drinking alcohol.  According to Moses, the men were drinking beer and vodka at the first party until the party ended around 8:00 or 9:00 p.m.  Party goers including Albert then went to a separate residence on Awanei Street in Waipahu to continue drinking and partying.  Moreover, a forensic pathologist who conducted an autopsy on Albert testified that alcohol had been present in Albert's blood.  Further, David introduced evidence that on a prior occasion in November 2008, Albert had yelled profanities at a police officer and resisted arrest while he was intoxicated.

7

Given the record in this case, there was extensive evidence that Albert had been drinking alcohol prior to the incident with David and also evidence of Albert's conduct in November 2008, when he was allegedly intoxicated and arrested. Therefore, excluding the evidence of Albert's blood-alcohol concentration level did not clearly exceed the bounds of reason or disregard rules or principles of law and was not substantially detrimental to David's defense.  We thus conclude that the Circuit Court did not abuse its discretion in excluding the evidence of Albert's blood-alcohol concentration level without an expert witness.

### B.  Alleged Prosecutorial Misconduct

David argues the Circuit Court erred in denying his motion for mistrial because the Deputy Prosecutor's misconduct violated David's right to a fair trial.  David contends the Deputy Prosecutor engaged in misconduct by: (1) making improper references to race that were designed to appeal to racial prejudice; (2) intentionally misrepresenting the facts of the case during rebuttal argument by referring to Albert as an innocent man; and (3) incorrectly stating that the case involved a murder weapon.

### 1.  Alleged improper reference to race

For the first time on appeal, David challenges the State's cross-examination of Honolulu Police Department Officer Violet Williams (**Officer Williams**) and the Deputy Prosecutor's reference to Officer Williams' testimony during rebuttal argument.  David cites the supreme court's opinion in State v. Rogan, 91 Hawaiʻi 405, 984 P.2d 1231 (1999) and argues in his opening brief:

> the [Deputy Prosecutor], with focused precision, adduced from Officer Williams that the 20 individuals fighting, yelling and being unruly in a parking lot appeared to be of the 'same or similar ethnic group.'  This was irrelevant, unnecessary and without any objectively legitimate basis related to any issue in the case.  The [Deputy Prosecutor] went on to methodically elicit that the individuals had 'brown skin,' 'black hair,' 'dark eyes,' 'they all appeared to be Pacific Islanders,' and 'they all appeared to be people who may have hailed from Micronesia.'  Again, there

> was no purpose, no issue and no relevance to any of the foregoing details except to insinuate that the brown skin, black hair, dark eyed, Pacific Islanders from Micronesia, like [David], are drunken, violent, incredible and dismissible because of their brown skin, dark eyes, black hair, ethnic origin and race. This is supported by the [Deputy Prosecutor's] rebuttal argument, which stated in relevant part, 'Officer Williams arrested Santhony Albert for swearing at her and touching her arm, to which the prosecution simply shrugs its shoulders with a rhetorical 'so what'?'  The clear statement made by the [Deputy Prosecutor's] questioning and argument was that people of this appearance and from this ethnic background like [David] are drunken violent individuals who don't matter.  And as to [David's] case, defense and life –- 'so what?' **He** didn't matter.

David's arguments fail to recognize the relevant context for both the Deputy Prosecutor's cross-examination of Officer Williams and the Deputy Prosecutor's rebuttal argument. The charges against David in this case stem from an incident between David and Albert on or about January 2, 2011.  In his defense case, David called Officer Williams to testify about the previous incident on November 29, 2008, in which Albert was arrested for Harassment.  Before Officer Williams testified, the jury was instructed that, if believed, the evidence about to be received regarding Albert's prior arrest for Harassment may be considered only on the issue of who was the first aggressor on January 2, 2011.  On direct examination, Officer Williams testified that early in the morning of November 29, 2008, she responded to a "fight call" at 1249 North School Street, which is "at the Puerto Rican Hall," where there were about 20 males and females yelling at each other in the parking lot and a male swinging a bat towards the crowd.  Officer Williams lost track of the man with the bat as he ran toward the back of a building and then, while she was instructing people to leave the parking lot, Albert pushed her arm from behind and said "fuck you, you bitch." Albert called her a "pig," continued to yell and swear, and Officer Williams described his demeanor as "extremely irate, he was yelling profanities, calling me slang names, just uncooperative and disrespectful."  Officer Williams further testified that, based on her training and experience, Albert appeared to be intoxicated and that she needed assistance in

arresting him because he would not cooperate and refused to enter the police vehicle.

The State then cross-examined Officer Williams and David points to the following parts of the cross-examination:

> [Q]:  And, in fact, it's extremely dark at the Loi Kalo Mini Park, isn't it?
>
> [A]:  It's pretty dimly lit, yes.
>
> [Q]:  There are no overhead lights in the park immediately makai of Puerto Rican Hall; right?
>
> [A]:  I do not recall that there is lights, yes.
>
> [Q]:  And, in fact, Puerto Rican Hall because it's on that downslope is not immediately under the streetlights on North School Street?
>
> [A]:  Yes, sir.
>
> . . .
>
> [Q]:  What did Santhony Albert look like that night, tell us, how tall was he?
>
> [A]:  According to my report, sir, about five-five.
>
> [Q]:  So you don't have any personal recollection of this, it's only based on your report?
>
> [A]:  Correct.
>
> [Q]:  What about his hair length, long or short?
>
> [A]:  Unknown, sir.
>
> [Q]:  Unknown again because it was ten years ago?
>
> [A]:  Yeah.
>
> . . .
>
> [Q]:  Now, of these 20 individuals, did they, from your experience as a police officer and experience patrolling Kalihi, appear to be of the same or similar ethnic group?
>
> [A]:  Yes, sir.
>
> [Q]:  Brown skin?
>
> [A]:  Yes.
>
> [Q]:  Black hair?
>
> [A]:  Possibly, because it was dark.
>
> [Q]:  Dark eyes?
>
> [A]:  Yes.

[Q]:  They all appeared to be Pacific Islanders, didn't they?

[A]:  Yes.

[Q]:  In your experience they all appeared to be people who may have hailed from Micronesia?

[A]:  Correct.

[Q]:  Now, with regards to this person with the bat, when you arrived, this person just melted into the crowd; right?

[A]:  Sort of stood out.

[Q]:  Okay.

[A]:  Yes.

[Q]:  But after when you arrived, that person didn't stay, that person --

[A]:  That's correct, he ran.

[Q]:  While you were at the scene, no one made a complaint to you that they had been struck by a bat; right?

[A]:  Correct.

[Q]:  So, in fact, you lost sight of this person in the red shirt?

[A]:  Yes.

[Q]:  Because there were all of these people there?

[A]:Yes.

David then points to the Deputy Prosecutor's rebuttal argument referring to the testimony by Officer Williams, in which the Deputy Prosecutor argued:

> It is simply wrong for the defense to suggest that an incident that happened on November 29, 2008, ten years ago has any bearing on the fatal stabbing.  <u>Officer Williams arrested Santhony Albert for swearing at her and touching her arm, to which the prosecution simply shrugs its shoulders with a rhetorical 'so what?' That has nothing to do with the defendant's state of mind when he stabbed his cousin.</u>  It has nothing to do with whether Santhony was the aggressor or not.

(emphasis added).

> As a threshold matter, we consider whether the actions of the prosecutor *sub judice* did indeed constitute prosecutorial misconduct. See, e.g., *[State v. McGriff*, 76 Hawaiʻi 148, 160, 871 P.2d 782, 794 (1994)]* (first holding that there was no prosecutorial misconduct, then considering prejudice arguendo ); *State v. Lincoln*, 3 Haw.App. 107, 125, 643 P.2d 807, 820 (1982) ('Since we find that the [prosecutor's] comments were not improper, we need not address the question as to whether the [jury] instruction

> cured the problem that would have been created by an
> improper comment.' (Footnote omitted.)).

State v. Kiakona, 110 Hawaiʻi 450, 458, 134 P.3d 616, 624 (App.2006).

We note that, "the Rogan court set forth principles specifically applicable to appeals to racial prejudice during closing argument."  State v. Shabazz, 98 Hawaiʻi 358, 376, 48 P.3d 605, 623 (App.2002) (quoting Rogan, 91 Hawaiʻi at 413–14, 984 P.2d at 1239–40 (holding "references to race that do not have an objectively legitimate purpose constitute a particularly egregious form of prosecutorial conduct")) (internal quotation omitted).  Additionally, in Shabazz, this Court concluded that "it matters little where and when in the trial improper prosecutorial appeals to race prejudice occur.  While such remarks in closing arguments may be fresher and more memorable to a deliberating jury, those made in opening statements can be an infusion that imbrues and imbues the entire course."  Id. at 378, 48 P.3d at 625.

Notwithstanding David's argument, we conclude that neither the Deputy Prosecutor's cross-examination nor the rebuttal argument were "contrived to stimulate racial prejudice." Rogan, 91 Hawaiʻi at 415, 984 P.2d at 1241 (holding prosecutor's statement that finding "some black, military guy on top of your daughter" is "every mother's nightmare" was egregious misconduct).  A full review of Officer Williams' cross-examination shows that the Deputy Prosecutor challenged her recollection of the events of November 29, 2008, which occurred in a dimly lit area 10 years prior to her testimony in the second jury trial, and that the Deputy Prosecutor sought to establish that Albert was not the man who had swung the bat and that there were four other persons of interest and not Albert.  The Deputy Prosecutor's questions did not invite Officer Williams to make any improper comments or insinuations based on race.  Likewise, the Deputy Prosecutor's rebuttal argument did not make any insinuation based on David's race.  Rather, the Deputy Prosecutor asserted that the prior November 2008 incident involving Albert

had no bearing on David's state of mind when he stabbed Albert in this incident.  Therefore, the Deputy Prosecutor's references to race during the cross-examination of Officer Williams and the Deputy Prosecutor's race-neutral comments during rebuttal argument do not constitute prosecutorial misconduct.

### 2.  Alleged misrepresentation of facts by referring to Albert as an innocent man

David argues the Deputy Prosecutor materially misrepresented the facts of the case by referring to Albert as an "innocent man" with "innocent blood."  David contends that the Deputy Prosecutor's comments were factually incorrect because Albert had injured David in a separate altercation earlier that night which resulted in a cut on David's nose.  David fails to cite to any authority in support of his contentions.

The State's theory of the case was that David started the fight and was not legally justified when he fatally stabbed Albert.  David's theory of the case was that Albert had been the first aggressor while intoxicated and David had acted in self-defense.  During the State's closing argument, the Deputy Prosecutor referred to the injury on David's nose as follows:

> [David] had a minor, insignificant scratch to his nose.  Torokkas Kikku testified at this trial that he was bleeding just a little.  At another proceeding on October 3rd, 2011, she said it wasn't bleeding at all.  Notwithstanding a relatively minor scratch at the top of his nose, the defendant said to Santhony Albert, why did you do this?  No man ever did these -- did things like this to me.
>
> This is a window into his thinking before he stabbed his cousin.  Enraged that he had been subjected to this relatively minor injury, the defendant was angry.  He was upset and he took it out on his unsuspecting cousin.

In the State's rebuttal argument, the Deputy Prosecutor asserted:

> [t]he defense argues that perception is reality and that somehow the prosecution has foisted upon you rose-colored lenses through which it asks you to view this case.  What is rose-colored about this case?  An innocent man is dead and his killer has deliberately testified falsely as to the circumstances that led to his death.  There's nothing rose-colored about this.
>
> The defense argument is that all of the prosecution's witnesses, their perception must be mistaken, faulty, or purposely they said something that was not true, yet urging

> upon you the narrative of the defendant whose own version of the events is contradicted by common sense, life experience and the credible evidence.
>
> The defense doesn't have to prove anything, fill in any pukas, give any explanations.  But in the 45 minutes that have been argued to you, there has been no presentation of rebuttal to the prosecution's core argument that the defendant's version of events is factually impossible.  It is factually impossible for the defendant to have stabbed and killed his cousin in the way he's described.  Impossible.  That is the most important fact of this case.
>
> . . .
>
> Ladies and gentlemen of the jury, this case is not about cultural beliefs of the Chuukese culture.  This case is about the legal -- the legally unjustified killing of an innocent man.  This case is not about mwanichis and birth order but, rather, about manslaughter and an innocent man's blood.

A prosecutor is allowed wide latitude in discussing the evidence and may state, discuss, and comment on the evidence as well as draw all reasonable inferences from the evidence during closing argument.  State v. Pasene, 144 Hawaiʻi 339, 367, 439 P.3d 864, 892 (2019) (quoting Rogan, 91 Hawaiʻi at 412, 984 P.2d at 1238).  "A prosecutor exceeds the acceptable scope of closing argument when a statement cannot be justified as a fair comment on the evidence but instead is more akin to the presentation of wholly new evidence to the jury, which should only be admitted subject to cross-examination, to proper instructions and to the rules of evidence."  Id. at 367-68, 439 P.3d at 892-93 (quoting State v. Underwood, 142 Hawaiʻi 317, 326, 418 P.3d 658, 667 (2018)).  Furthermore, "prosecutors are bound to refrain from expressing their personal views as to a defendant's guilt or the credibility of witnesses."  Cordeiro, 99 Hawaiʻi at 424-25, 56 P.3d at 726-27.

Here, the Deputy Prosecutor's rebuttal argument made reasonable inferences based on conflicting witness testimony. See State v. Austin, 143 Hawaiʻi 18, 44, 422 P.3d 18, 44 (2018) ("it is not improper for prosecutors to assert that a defendant's testimony is not credible in a variety of ways so long as such an inference is reasonably supported by the evidence").  In substance and consistent with the State's theory and presentation

of evidence, the Deputy Prosecutor argued that Albert was "innocent" because he was not the aggressor for the altercation which ended in his death.  The Deputy Prosecutor's references to Albert as an "innocent man" and "innocent man's blood" was fair comment based on evidence in the record, and thus did not constitute prosecutorial misconduct.

### 3.  Improper reference to a missing "murder" weapon

David also argues the Deputy Prosecutory improperly misrepresented the facts in arguing "that the case involved a murder" by referring to a missing murder weapon.  Specifically, during rebuttal argument, the Deputy Prosecutor stated, "what was not there was the murder weapon."  Although this comment was factually incorrect, because the second trial involved a manslaughter charge and not a murder charge, the impropriety was harmless.

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of 'whether there is a reasonable possibility that the error complained of might have contributed to the conviction.'" Austin, 143 Hawaiʻi at 28, 422 P.3d at 28 (citing State v. Sawyer, 88 Hawaiʻi 325, 329 n.6, 966 P.2d 637, 641 n.6 (1998) (quoting State v. Balisbisana, 83 Hawaiʻi 109, 114, 924 P.2d 1215, 1220 (1996)).

"Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial."  Id. at 39, 422 P.3d at 39 (quoting Clark, 83 Hawaiʻi at 304, 926 P.2d at 209).  When determining whether the alleged prosecutorial misconduct rises to the level of reversible error, this court considers three factors: (1) the nature of the alleged misconduct; (2) the promptness or lack of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.  Id. at 40, 422 P.3d at 40.

Although it was an improper error for the Deputy Prosecutor to refer to the missing weapon as a murder weapon, this was an isolated incident.  The Deputy Prosecutor later reiterated that the case was about manslaughter and there were no further references to a murder or a murder weapon.  As a result, the first factor, the nature of the alleged prosecutorial misconduct weighs against David.

Prior to closing arguments, the jury was instructed to "disregard entirely any matter which the Court has ordered stricken."  David immediately objected to the Deputy Prosecutor's reference to a missing murder weapon and the Circuit Court promptly instructed the jury that the "State's last argument about the weapon is stricken and you are not to consider it." The jury is presumed to follow the court's curative instructions. State v. Acker, 133 Hawaiʻi 253, 278, 327 P.3d 931, 956 (2014). Therefore, the second factor, the promptness or lack of curative instruction also weighs against David.

There were no witnesses who saw David stab Albert. David's defense largely relied on the credibility of his testimony which was contradicted by the State's witnesses, Ewen and Kikku.  See Rogan, 91 Hawaiʻi at 415, 984 P.2d at 1241 (evidence against defendant was not overwhelming where the case against defendant hinged on the credibility of complainant and contradictory testimony).  Thus, the third factor, the strength or weakness of the evidence against the defendant weighs in favor of David.

Given the isolated nature of the misconduct, the prompt instruction to the jury to disregard the Deputy Prosecutor's comment about the weapon, and absent indication in the record that the jury failed to adhere to the instructions, we conclude there is no reasonable possibility that the Deputy Prosecutor's misconduct characterizing the weapon as a murder weapon contributed to David's conviction.

### III.  Conclusion

Based on the foregoing, the Judgment of Conviction and Sentence entered on February 28, 2019, by the Circuit Court of the First Circuit, is affirmed.

DATED:  Honolulu, Hawaiʻi, September 30, 2020.

On the briefs:

Taryn R. Tomasa,
Deputy Public Defender,
Office of the Public Defender,
for Defendant-Appellant.

Brian R. Vincent,
Deputy Prosecuting Attorney,
for Plaintiff-Appellee.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Derrick H.M. Chan
Associate Judge

/s/ Keith K. Hiraoka
Associate Judge